THE SOUTH PARK COMMISSIONERS, Appellant, *vs.* MONT-
GOMERY WARD & Co. *et al.* Appellees.—Same Appellant
*vs.* S. KARPEN & BROS. *et al.* Appellees.

*Opinion filed December 21, 1910—Rehearing denied Feb. 8, 1911.*

1. EMINENT DOMAIN—*right of eminent domain is an inherent
attribute of sovereignty.* The right of eminent domain is an in-
herent attribute of sovereignty, existing independently of written
constitutions or statutory laws, although it is regulated by appro-
priate legislation, and is the power of the sovereign to appropriate
private property to the public use, limited only by the constitutional
provision for compensation.

2. SAME—*the right of eminent domain extends to every kind of
property.* The sovereign right of eminent domain extends to every
kind of property, including not only that which is tangible but also
all rights and interests of any kind, including easements.

3. SAME—*right of eminent domain is not unrestricted.* While
the questions of the necessity and propriety of the exercise of the
right of eminent domain are legislative and not judicial, yet the
power to exercise such right is not unrestricted, and it cannot be
abused to the injury of well recognized private rights.

4. SAME—*lawful public use lies at foundation of right to con-
demn.* A lawful public use lies at the foundation of the right to
appropriate private property or property rights, and in the absence
of such use the existence of an act of the legislature authorizing a
proceeding to condemn is immaterial.

5. SAME—*legislature cannot authorize taking of private prop-
erty for an illegal use.* The legislature, being restricted by the re-
quirement that the use shall be public and lawful, cannot authorize
the taking of private property of a citizen for an illegal use, and
the courts are not without power to determine that question.

6. SAME—*use may be public and yet destructive of some natu-
ral or constitutional right.* A use may be public in the broadest
sense of being open to all alike upon the same terms and condi-
tions and as being a matter of right and not a mere favor to the
public, and yet be against public policy because destructive of the
health, morals and welfare of society or subversive of some natu-
ral or constitutional right.

7. SAME—*what questions may be determined by the court.* In
a condemnation proceeding the court has the right to determine
whether the proposed use is a public use, whether such use or
purpose justifies the exercise of the compulsory taking of private
property under the statutes and constitution, and, where the peti-

tioner is a private corporation, whether the power has been delegated to such corporation by the legislature and whether the uses and purposes for which the power is sought to be exercised fall within the legislative grant of powers.

8. SAME—*power to condemn property is limited by power to appropriate it to the particular use.* If there is a want of power to appropriate private property to a particular use there can be no condemnation of rights in such property, whatever the nature of those rights may be.

9. SAME—*right of abutting owners to have Grant Park, in Chicago, kept free from buildings cannot be condemned.* The right of abutting owners to have Grant Park, in Chicago, kept free from buildings rests upon an accepted dedication of the land to a specified and restricted use, which neither the city nor the legislature has power to change or disregard; and such right cannot be condemned, either with or without legislative authority, to enable the park commissioners to erect buildings in such park.

10. DEDICATION—*dedicator has a right to specify use and impose restrictions.* An owner making a donation of his land to the public has the right to specify the particular use to which the land is to be devoted and to impose restrictions on such use, and if the dedication is accepted the land cannot be applied to any other use nor can the restrictions be disregarded, as it is only where property is dedicated generally, without restriction, to the use of the public, that it may be applied to such uses as the public may desire.

11. SAME—*what is not such a dedication as precludes a change of use.* Where a proprietor subdivides his land and sells lots with a dedication of a portion of the land for the common use of the owners of the lots, there is no acceptance by the public for a specified use such as precludes a change of such use, and such portion is not a park nor public property nor exempt from taxation.

12. SAME—*land dedicated to a specified use will revert to dedicator if use is changed.* Where land is dedicated to the public for a specified use under certain restrictions and the dedication is accepted by the public, a subsequent appropriation of the land to inconsistent uses, in violation of the terms and restrictions of the dedication, will cause a reverter of the land to the dedicator and a loss of the same to the public.

13. SAME—*State cannot change use for which property was dedicated.* If the owner of private property offers to donate it to the public for a specified public use, and the offer is accepted and the property devoted to such use, the State cannot change the use and apply the property to some other use inconsistent with the dedication.

14. RES JUDICATA—*the doctrine of res judicata is not limited to matters actually determined.* Where there is identity of parties, subject matter and cause of action, the doctrine of *res judicata* extends not only to every matter that was actually determined in the former suit, but to every other matter which might have been raised and determined in it.

15. SAME—*the character of rights of abutting owners in Grant Park, in Chicago, is res judicata.* That the right of abutting owners to have Grant Park, in Chicago, remain free from buildings is more than a mere property right which can be compensated in damages or a mere limited right to a temporary injunction until damages can be ascertained and paid, is conclusively settled by the former litigation between the parties over this question wherein the erection of buildings of any kind in such park was permanently enjoined. (*Chicago* v. *Ward,* 169 Ill. 392, *Bliss* v. *Ward,* 198 id. 104, and *Ward* v. *Field Museum,* 241 id. 496, adhered to.)

DUNN, HAND and CARTER, JJ., dissenting.

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

TOLMAN, REDFIELD & SEXTON, (JOHN P. WILSON, EDGAR BRONSON TOLMAN, JOHN BARTON PAYNE, and LEONARD A. BUSBY, of counsel,) for appellant.

ELBRIDGE HANECY, and GEORGE P. MERRICK, for appellee A. Montgomery Ward, (GEORGE P. MERRICK, for Montgomery Ward & Co. *et al.*)

MAYER, MEYER, AUSTRIAN & PLATT, (LEVY MAYER, of counsel,) for appellees S. Karpen & Bros. *et al.*

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The appellant, the South Park Commissioners, a municipal corporation having charge and control of Grant Park, in the city of Chicago, appealed from four judgments of the superior court of Cook county dismissing its petitions for the condemnation of the rights and easements to have the park kept free from buildings and to preserve it for the purposes of the original dedications which the petitions

alleged were vested in Montgomery Ward and others, as owners of lots in Fort Dearborn addition, and S. Karpen & Bros. and Levy Mayer, as owners of lots in Fractional Section 15 addition to Chicago, opposite the park, and inasmuch as a material question in all the cases is the same they have been heard together. They bring up again the question of the right to erect buildings in the park, which was adjudicated as between the city and Montgomery Ward in *City of Chicago* v. *Ward,* 169 Ill. 392, as between commissioners of the State and Ward in *Bliss* v. *Ward,* 198 id. 104, and as between Ward and the appellant and the Field Museum in *Ward* v. *Field Museum,* 241 id. 496. Two of the petitions prayed for the ascertainment of the compensation to be paid to the owners of lots for the rights and easements, interests and property to be taken by the erection and maintenance of the Field Museum of Natural History in the park, and two contained like prayers for the ascertainment of the compensation to be paid for the same rights to be taken by the erection and maintenance of the Crerar Library in the park. They were filed in pursuance of the provisions of the acts of 1903 permitting the location of this museum and public libraries in the park. The act of 1903, which was under consideration in *Ward* v. *Field Museum, supra,* authorizing park commissioners to permit the directors or trustees of a museum at that time located in a public park to erect and maintain such museum within any public park under the control or supervision of such park commissioners, also provided that if any owner or owners of any lands or lots abutting or fronting on such public park had any private right, easement, interest or property in such park which would be interfered with by the erection and maintenance of such museum, or any right to have the park remain open or vacant and free from buildings, the authorities having control of the park might condemn the same under the act providing for the exercise of the right of eminent domain. (Laws of 1903, p. 263.)

There was a similar provision in the act of 1903 authorizing park commissioners to permit any free public library to be erected in any public park under their control. (Laws of 1903, p. 262.) On January 5, 1910, the petitioner passed an ordinance for acquiring, by condemnation, all rights and easements in the park requisite for the construction of the museum, which was to occupy a space 1300 feet long north and south and 800 feet wide from east to west, and another ordinance for condemning such easements for the construction and maintenance of the John Crerar Libray in the park, between Madison and Monroe streets extended east. The defendants, claiming that the petitioner had no lawful right to permit the erection of buildings in the park, filed their motions to dismiss the petitions; denying that the proposed uses were public in their nature; alleging that the acts of the legislature under which the proceedings were instituted were in conflict with the constitution and therefore void, (and particularly that the act in regard to the museum was unconstitutional as applying only to the Field Museum and granting to a private corporation an exclusive privilege or franchise,) and that the prior judgments against the petitioner, or those represented by it and with whom it was in privity, were final adjudications against the right to disregard the restrictions of the original dedications. The court sustained the motions and dismissed the petitions.

Inasmuch as a determination of the question whether the legislature could authorize the erection of buildings in Grant Park contrary to the terms of the dedications of the property for park purposes will dispose of the cases, other questions will not be considered.

The Field Museum is a private corporation, and the act authorizing the erection of its building in the park, which limited the privilege to museums located in a public park on the first day of July, 1903, was intended to apply, and as a matter of fact did apply, only to that corporation. The superior court was of the opinion that the act was in

violation of the constitution, as granting an exclusive privilege to the corporation, but if the legislature could not by any act authorize the erection of a building in the park, any question of a special privilege is not material. There are also questions as to the nature and limits of public uses, and in *Ward* v. *Field Museum, supra,* a great deal of evidence was taken to prove that such buildings as museums were situated in various public grounds called parks, in different parts of the world. We declined to consider that question, and said that questions concerning the proper uses of public parks and what buildings had been erected in other parks were not involved in that case. In the common understanding, a park, in this country, is a piece of ground in or near a city or town for ornament and as a place for the resort of the public for recreation and amusement, and it is usually laid out in walks, drives and recreation grounds. (*Village of Riverside* v. *MacLain,* 210 Ill. 308; Webster's Dict.; 29 Cyc. 1684; 21 Am. & Eng. Ency. of Law,—2d ed.—1066.) Whether a public library which is not for amusement or recreation but for educational purposes, or a museum maintained mainly for scientific investigation and instruction in geology, ethnology and other kindred sciences and in which entertainment and amusement is only incidental, is a legitimate part of a park might be proper questions for consideration in some cases; but if the only right which the defendants have consists of easements, in connection with their property, of an unobstructed view and such easements can be taken from them by condemnation, it is not material to them what the uses of the building are. If buildings should be erected not proper in a public park, and therefore a public nuisance, they might be abated at the suit of any one aggrieved, but the material question in these cases is the right to erect any sort of building in the park.

The right of eminent domain is an inherent attribute of sovereignty, existing independently of written constitu-

tions or statutory laws, athough it is regulated by appropriate legislation. It is the power of the sovereign to appropriate private property to the public use, limited only by the constitutional provision for compensation. It extends to every kind of property, including not only that which is tangible, but all rights and interests of any kind, including easements. (*Johnson* v. *Joliet and Chicago Railroad Co.* 23 Ill. 202; *Metropolitan City Railway Co.* v. *Chicago West Division Railway Co.* 87 id. 317; *Sholl* v. *German Coal Co.* 118 id. 427.) Questions of the necessity and propriety of the exercise of the right are legislative and not judicial. (*Chicago, Rock Island and Pacific Railroad Co.* v. *Town of Lake,* 71 Ill. 333; *Pittsburg, Ft. Wayne and Chicago Railway Co.* v. *Sanitary District,* 218 id. 286.) But the power is not unrestricted and without bounds. The legislature are restricted by the requirement that the use shall be public and lawful, and the power cannot be abused to the injury of well recognized private rights. The legislature cannot authorize the taking of the property of the citizen for illegal uses, and the courts are not without power to determine that question. A use might be public, in the broadest sense, as being open to all alike upon the same terms and conditions and the right of the public to use and enjoy the property taken from the citizen be an absolute right and not a mere favor, and yet the use be against public policy because destructive of the health, morals and welfare of society or subversive of natural or constitutional right. The courts have a right to determine such questions and may decide whether the use to which it is sought to appropriate the property is a public use; whether such use or purpose would justify the exercise of the compulsory taking of private property under the statute and constitution; and, where the power is attempted to be exercised by a corporation, whether the power has been delegated to the corporation by the legislature, and whether the uses and purposes for which the power is sought to be ex-

248—20

ercised fall within the legislative grant of powers. (*Chicago, Rock Island and Pacific Railroad Co.* v. *Town of Lake, supra; South Chicago Railroad Co.* v. *Dix,* 109 Ill. 237; *Chicago and Eastern Illinois Railroad Co.* v. *Wiltse,* 116 id. 449; *Pittsburg, Ft. Wayne and Chicago Railway Co.* v. *Sanitary District, supra; County of Mercer* v. *Wolff,* 237 Ill. 74.) Accordingly, a railroad company invested with power to exercise the right of eminent domain but having no right to locate its road on a particular piece of property, has not been permitted by the courts to exercise such right for the purpose of appropriating that property to its use. (*Lake Shore and Michigan Southern Railway Co.* v. *Baltimore and Ohio and Chicago Railroad Co.* 149 Ill. 272; *Chicago, Burlington and Quincy Railroad Co.* v. *City of Chicago,* id. 457; *Cairo, Vincennes and Chicago Railway Co.* v. *Woodyard,* 226 id. 331.) The ground of those decisions was, that there was no power to appropriate the particular property to the contemplated use. If the legislature had no power to change the uses of Grant Park and to disregard the terms of the dedications by authorizing the erection and maintenance of buildings in the park, there could be no condemnation of the rights of the defendants that the park should be kept free from buildings, whatever the nature of such rights might be. It is not thought that the State can divest itself of the right of eminent domain to take private property for public use, but the settled law of this State is that if the owner of private property offers to donate it to the public for a specified public use, and the offer is accepted and the property devoted to such use, the State cannot change the use and apply the property to some other use inconsistent with the dedication. Grant Park is already devoted to a public use, and the only question to be decided is whether that use can be changed.

Disregarding for the present the question of *res judicata,* the general question whether property dedicated to a particular public use can be diverted to a different use has

been before this court in a number of cases and with uniform results. In the early case of *City of Alton* v. *Illinois Transportation Co.* 12 Ill. 38, certain lands lying between Front street and the Mississippi river, in the town of Alton, had been dedicated to the public as a public landing place, and the court declared the doctrine that, whatever title to the same might be vested in the city of Alton, the city had not the unqualified control and disposition of them; that they were dedicated to the public for particular purposes and only for such purposes could they be rightfully used, and that for those purposes, alone, the city might improve and control them.

In *City of Jacksonville* v. *Jacksonville Railway Co.* 67 Ill. 540, land had been dedicated for a public square, and by an act of the legislature the railway company was authorized to construct and operate its railway over and across any public grounds and squares within the town. The railway company attempted to exercise the power so given by the legislature but was perpetually enjoined from all attempts to do so. This court held that a power could not exist in the legislature to divert property from the purpose for which it was donated; that the donation in that case was made for a certain specific and defined purpose; that it must be preserved or the land must revert to the original proprietors, and that a court of equity would enforce the execution of the trust, either upon the application of the owners of lots abutting upon the square or of the city. Under the law as there declared, if the legislature should, contrary to the expressed terms on which the public grounds in Fort Dearborn addition were dedicated, appropriate the same to inconsistent uses, the lands would revert to the United States, the original dedicator, and lands of incalculable value might be lost to the public.

The question in *United States* v. *Illinois Central Railroad Co.* 154 U. S. 225, was whether the United States, as grantor of the public grounds in Fort Dearborn addi-

tion, retained such an interest therein as entitled them to control and regulate the execution of the trusts created in the dedication, and it was held that they did not, but there was no intimation that there was not a possibility of reverter upon a violation of the condition of the dedication.

In *Village of Princeville* v. *Auten,* 77 Ill. 325, the village board of trustees attempted to locate a town hall on a public square. Although the plat did not indicate the manner in which the public might enjoy the dedication, the intention of the dedicators was proved by their oral declarations, and it was held that the village trustees had no authority to appropriate the square, in whole or in part, as a site for buildings against the wishes of any citizen interested.

In *Village of Riverside* v. *MacLain, supra,* where a tract in the village of Riverside had been dedicated as a public park and the proprietors exhibited maps and plats showing such dedication in the sale of lots, the village, having power to lay out streets, attempted to lay one across the park. The park was a small one, set with trees and bushes, and the proposal was to put a roadway through it at an elevation of five feet, cutting the park in two and destroying its usefulness as a park. It was not permitted, although there was no express prohibition in the dedication. The court pointed out the distinction between cases where property is dedicated to public uses without restriction or has been established under statutory provisions, and cases where the dedication is restricted to particular purposes by the original owner and the dedication is accepted. Presumably the dedicator would not make the donation to the public except upon terms and conditions which he specifies, and the public authorities having their election to accept or reject the donation, are bound, if they accept it, to apply the property to the declared use. It was held that the village, under its authority to lay out streets, could not lay out a street across the park. It is only where property

is dedicated generally, without restriction, to the use of the public that it may be applied to such uses as the public may desire. *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,* 79 Ill. 25.

These cases settle the law of this State to be, that an owner making a donation of his land to the public for a particular use has a right to specify the use and impose restrictions, and if the dedication is accepted, the land cannot be applied to any other use or the restrictions disregarded. Where a proprietor subdivides his land and sells lots with a dedication of a portion for the common use of the owners of lots, such portion is not a park nor public property nor exempt from taxation, (*McChesney* v. *People,* 99 Ill. 216,) and a case like *United States* v. *Certain Lands,* 112 Fed. Rep. 622, has no relation to the question here involved. There is in such a dedication no acceptance by the public for a specified use. In that case it was held that the erection and use of a fortification for coast defense which did not directly encroach upon private property was not a taking of property requiring compensation, and the claims were dismissed except as to a right to go upon and pass over a certain lot which was taken. The police power, which is not exercised through the right of eminent domain, is not involved in this controversy.

The question has also been finally adjudicated with respect to this particular park and between the same parties concerned in this litigation. In 1890 Montgomery Ward filed his bill in the superior court of Cook county to enjoin threatened violations of the terms of the dedications by the city, a local governmental agency of the State, and a final decree was entered restraining the city from erecting, or causing to be erected, any building or structure upon the premises described in the bill, extending from Randolph street to Park Row, with certain exceptions, and that decree was affirmed in *City of Chicago* v. *Ward,* 169 Ill. 392. It is urged against the application of the doctrine of *res*

*judicata* that the question of the right to erect buildings in the park upon ascertaining the compensation to be paid to Ward was not considered or decided in that case or the subsequent cases. That is true, but the basic question whether the legislature could authorize the construction of buildings in the park, which lies at the foundation of the right to condemn, was determined. If the legislature had no right to erect the buildings, which are now alleged to be a public use, they could not provide for taking the right of any person or appropriating his property for such use. To say that having acquired the right to ascertain and pay the damage to the property of Ward gives the right to change the use and violate the restriction which did not before exist would be reasoning backward. A superstructure does not support the foundation, and a lawful public use lies at the very foundation of the right to appropriate property or property rights. Moreover, the existence of an act authorizing a proceeding to condemn was immaterial. If it were conceded that Ward merely had a property right in the nature of an easement, which could be taken by process of condemnation, he could not have had an injunction against the erection of buildings in the park. Ward did not own or claim to own the fee in the park or any part of it, and if injury results to property not actually taken for a public use, the owner has no right to have his property condemned but is left to his action at law. The constitution forbids taking or damaging property for the public use without just compensation, but if no portion of a lot or tract of land is taken for the public use, the owner is not entitled to have proceedings instituted to ascertain what damages his property will sustain. An abutting owner has rights in a street for ingress and egress and easements of light and air, but the public authorities are not bound to stop and litigate with him the question of his damages nor institute a proceeding for condemnation. (*Penn Mutual Life Ins. Co.* v. *Heiss,* 141 Ill. 35; *Stetson* v. *Chi-*

*cago and Evanston Railroad Co.* 75 id. 74; *Peoria and Rock Island Railway Co.* v. *Schertz,* 84 id. 135; *County of Mercer* v. *Wolff, supra.*) In the case last cited it was said: "But when no part of the land of an abutting owner is taken, the constitution does not require the ascertainment and payment of his consequential damages before entry can be made upon adjoining property." Rigney had rights in a street which were interfered with by the construction of a viaduct cutting off access from his house and lot to an intersected street except by means of stairs, and he was permitted to recover damages for the injury to his property, (*Rigney* v. *City of Chicago,* 102 Ill. 64,) but he could not have had an injunction against the construction of the viaduct. So, also, the city interfered with the ingress and egress to the property of Jackson by changing the grade of the street in the construction of a subway under a track elevation ordinance, and he was permitted to recover his damages but could not have had an injunction. (*City of Chicago* v. *Jackson,* 196 Ill. 496.) In the second case, *Bliss* v. *Ward,* 198 Ill. 104, the legislature had undertaken to authorize the construction of an armory and parade grounds in the park, so that the legislature had made a direct attempt to change the use and disregard the restriction, but it was held that the legislature did not have such power. If the injury to Ward consisted merely in damages to his property and his only right was to have compensation for such damages, the commissioners of the State would never have been enjoined from building the armory. The act of 1861, amending the charter of the city of Chicago, (Private Laws of 1861, p. 136,) did not give a right to an injunction except to prevent violations of section 64 and a certain ordinance forbidding encroachments by any railroad company on the land between Michigan avenue and the Illinois Central railroad. Ward acquired no right by that act to enjoin the building of the armory or Field Museum. When the last case, *Ward* v. *Field Museum,*

*supra,* was instituted, the act providing for condemnation of his rights had been passed, and if the fact was of any importance it was the duty of appellant and the Field Museum to set it up and claim such rights as it gave them. In fact, it was set up by answer and cross-bill, and if the act was valid and the legislature had power to change the use by compensating Ward for the depreciation of his property, there could have been no injunction, except one restraining the erection of the building, until his compensation should be ascertained and paid. The doctrine of *res judicata* extends not only to every matter that was actually determined in the former suit, but to every other matter which might have been raised and determined in it. (*Rogers* v. *Higgins,* 57 Ill. 244; *Harmon* v. *Auditor of Public Accounts,* 123 id. 122; *Harvey* v. *Aurora and Geneva Railway Co.* 186 id. 283; *Ward* v. *Field Museum, supra; People* v. *Superior Court,* 234 Ill. 186.) If Ward had no right to an injunction, except a limited one, until his damages would be ascertained and paid, it was the duty of the defendants to present that question and claim their right under the act. The injunction was made perpetual, and all questions that might have been raised were determined adversely to the petitioner in this case, although, as we have already seen, a court of equity would not have given Ward an injunction if the proposed use had been lawful. The question considered in the former cases was simply whether the legislature, or any of its subordinate agencies, could disregard the prohibition against buildings in the park, and that was the question decided. It was determined in each case that he occupied a position which gave him a right to enforce the restriction as one having a special interest in having it enforced. It was decided in the previous suits that there was no lawful authority for the erection of buildings in Grant Park, and without such authority there could be no valid law authorizing the condemnation of property for that purpose. If the provisions contained in the first sections of the

two acts of 1903 for the erection of the museum and public libraries in the park were beyond the power of the legislature, they were not brought within it by filing petitions under the other provisions of the same sections.

The judgments are affirmed.    *Judgments affirmed.*

Mr. JUSTICE DUNN, dissenting:

These appeals present a new aspect of the controversy in regard to the erection of buildings in Grant Park, in the city of Chicago. In previous cases it has been decided that under the terms of the dedication no building of any kind can be erected upon any part of the park. (*City of Chicago* v. *Ward,* 169 Ill. 392; *Bliss* v. *Ward,* 198 id. 104; *Ward* v. *Field Museum,* 241 id. 496.) The opinion in the last case contains a statement of the material facts governing the rights of the parties and a history of the litigation by which the restrictions imposed by the dedication of the park have been hitherto enforced.

The act of May 14, 1903, giving the corporate authorities of park districts power to erect and maintain museums in any park and to permit the directors or trustees of any museum to erect the same in any park, by the authority of which the South Park Commissioners entered into the contract with the Field Museum of Natural History for the erection of its museum in Grant Park, as mentioned in the case of *Ward* v. *Field Museum, supra,* contained the further provision that if any owner of lands adjacent to such park should have any private right or easement in such park appurtenant to his lands or any right to have such park remain open or vacant and free from buildings, the corporate authorities of the park district may condemn the same in the manner prescribed by statute for the exercise of the right of eminent domain. Accordingly, after the final decision of that case again declaring the existence of such private rights and easements, the South Park Commissioners, on January 5, 1910, passed an ordinance providing for the

acquirement, by condemnation, of all rights and easements in Grant Park requisite for the construction of the museum, and a petition was filed against Montgomery Ward & Co. and others, the owners of lots in the Fort Dearborn addition to Chicago, situated on the west side of Michigan avenue south of Washington street, praying for the condemnation of the rights, easements, interest and property appurtenant to the lots of such owners in, to or over Grant Park, so far as they will be interfered with, taken or damaged by the erection and maintenance of a museum. A like petition was filed against S. Karpen & Bros. and Levy Mayer, the owners of lots in Fractional Section 15 addition to Chicago, situated on the west side of Michigan avenue.

On May 14, 1903, there was also passed an act authorizing the corporate authorities of park districts to permit any free public library organized under the act "to encourage and promote the establishment of free public libraries in cities, villages and towns of this State," to erect and maintain its library building within any park, and having the same provisions in regard to the condemnation of rights and easements in the park as in the case of museums. Acting under the authority supposed to be conferred by this act, the commissioners, on February 15, 1905, granted to the John Crerar Library, a corporation organized under the act above mentioned, permission to erect and maintain a library building on Grant Park, having its west front on a line with the west front of the Art Institute, its north and south walls, respectively, equi-distant from the south line of Madison street extended east and the north line of Monroe street extended east, and not less than forty feet from such lines, and having its east wall at least twenty-five feet west of the west line of the right of way of the Illinois Central Railroad Company. On January 5, 1910, an ordinance was passed providing for the acquirement, by condemnation, of the private rights and easements in Grant Park of the own-

ers of the lots in the Fort Dearborn addition to Chicago
and the Fractional Section 15 addition to Chicago, and pe-
titions were filed against the same persons who were made
parties in the museum case, for the condemnation of their
rights and easements for the benefit of the library. · Motions
were made by the defendants to dismiss each of the peti-
tions for reasons stated, and on the hearing these motions
were sustained, the petitions were all dismissed and judg-
ments were rendered against the petitioner for costs.

The opinion of the majority of the court holds that the
dedication of the park imposed not only an inviolable re-
striction against the erection of any building whatever in
the park, but also a permanent and insurmountable barrier
to the exercise by the government of its power of eminent
domain, and that it was so decided in the three cases cited
above.   This position cannot be sustained.   In the first two
cases the right to the exercise of such power was not men-
tioned.   The defendants in those cases denied the existence
of any right to have the park remain free from buildings,
and were proceeding under the assumed authority of vari-
ous ordinances and statutes to erect buildings in disregard
of the claim of such right.   The bills were filed in those
cases to enjoin the erection of any buildings in the park,
and the court sustained the claim of an easement appurte-
nant to each lot on the west side of Michigan avenue from
Randolph street to Park Row to have the park, and every
part of it, including accretions and reclaimed land, kept
forever free from buildings.   It was decided that the park·
was held in trust for the public, subject to the restrictions
imposed by the instruments of dedication that neither the
State nor the city could disregard such restrictions, and
that the erection of the proposed buildings would be a di-
version of the property to·purposes·violative of the restric-
tions of the trust, which a court of equity could enjoin.   No
statute then in existence purported to authorize the con-
demnation of incorporeal rights of the character of those

held by appellees and no question in regard to the power of eminent domain over the easements in controversy was or could have been raised or decided in those cases.

The last of the three cases decided no more than was decided in the other two, and in the opinion it is said that the identical question in this case was decided in the former suits. "The question in the former cases," it is said, (p. 510,) "was not whether park buildings, museums or any particular kind of building could be erected on the premises, but whether a building of any kind could be so erected," and it is again declared that neither the legislature, nor any municipal corporation under the authority of the legislature, can violate the restriction imposed in the dedication of the park. It is true that the act of May 14, 1903, concerning museums in public parks, is set out in the bill in that case and averred to be null and void, while the answers admit the adoption of the act and allege that it is legal and valid. But whether valid or void, the act could not affect the merits of that case. It was not averred that any attempt had been, or was about to be, made under the act to condemn the complainant's easement, but the averment was that the defendants were intending to permit the erection of a museum building in said park, and unless restrained would thereby destroy or irreparably injure the complainant's easement. The commissioners had no right, acting under legislative permission or otherwise, to permit a violation of the trust under which the park was held. They could not disregard the complainant's property rights. Whether they had the power to condemn them was another question not involved in the issue. The South Park Commissioners filed a cross-bill, in which, among other things, the act of May 14, 1903, was set up, and it was prayed that if it should be held that the complainant had any right in the park, whatever interest he might have affecting the right of the commissioners to permit the erection of the museum building might be ascertained and compensation made

therefor. Manifestly, this was not a matter within the jurisdiction of a court of equity, and no adjudication could be made on this cross-bill of the question of the commissioners' right, under the act, to condemn the complainant's easement in the manner prescribed by the Eminent Domain act. No expression on that question is found in the opinion. It was not before the court, and in the decree rendered in the circuit court, in compliance with the mandate of this court, it is expressly stated that the right of eminent domain is not passed upon, as, indeed, under the mandate it could not be passed upon.

It is said that if the passage of the act of May 14, 1903, authorizing the condemnation of the appellees' easements, was of any importance, it was the duty of the appellant to set it up and claim such rights as it gave the appellant, and that if Ward had no right to an injunction, except a limited one until his damages would be ascertained and paid, it was the duty of appellant to present that question and claim its right under the act. Courts adjudicate the rights of parties upon the facts existing at the time of such adjudication and not upon hypothetical conditions which may or may not arise in the future. The bill which the court had under consideration was one to enforce the observance of the conditions of a trust. Under the facts then existing, the complainants, who were *cestuis que trustent* by virtue of their ownership of lots on the west side of Michigan avenue, were entitled to a decree enforcing the restrictions of the dedication by enjoining acts in violation of such restrictions. It was a matter of no importance whether or not the law authorized the condemnation of the appellees' easements so long as the appellant had not made and was not making any effort to condemn them, and the existence of that power unexercised did not limit Ward's right to a perpetual injunction. He was not in the position of an ordinary abutting owner who cannot have an injunction against an entry upon adjoining premises for public pur-

poses because of consequential damages to his property. He was entitled to enforce the terms of the trust, for a statute expressly conferred upon any person owning or interested in any lot fronting on Michigan avenue the right, by bill in chancery, to enforce the condition that the park should forever remain open and vacant and to enjoin any violation of such condition. (Private Laws of 1861, sec. 64, p. 136.) On the facts as they were, he was entitled to a perpetual injunction, but an adjudication to that effect did not determine that his rights could not be affected by subsequent events. If his rights should be subsequently released or otherwise terminated the injunction would· no longer be effectual. The decrees in all the former cases enjoined the defendants from doing acts which they had no right to do, because such acts violated the property rights of the complainant. This proceeding, prosecuted on behalf of the public, recognizing the existence of such property rights and the validity of the former decrees, seeks. to acquire the right to perform the acts enjoined, by condemning for the public use, in the manner authorized by the constitution, all the property rights which will be interfered with.

Eminent domain is the power of the State to appropriate private property to the public use. It is a right inherent in sovereignty, which extends to every kind of property and to every public use. (*Johnson* v. *Joliet and Chicago Railroad Co.* 23 Ill. 202.) Subject to the requirement of just compensation to the owner, it is without limitation, except that it can be exercised only for the public use. The property which may be taken includes not only tangible property but all rights and interests of any kind in real or personal property and in easements, franchises and incorporeal hereditaments. Whatever exists in any form, whether tangible or intangible, may, by virtue of this power, be seized and appropriated to public uses when necessity demands it. *Metropolitan City Railway Co.* v. *Chicago West Division Railway Co.* 87 Ill. 317.

It is insisted that because of the restriction imposed in the dedication of the park the State is deprived of its power of eminent domain over the property rights reserved or created by such restriction. It is said that the legislature has no power to change the legal result of the acts of dedication or to violate the restrictions imposed by such acts. The exercise of the power of eminent domain does neither. The State occupies a dual relation to the property. It is a trustee for the benefit of both the private and public interests involved. As the grantee of the title it is bound by the limitations of the instrument through which it received the title. It cannot divert the park from the particular purpose for which it was dedicated or disregard the limitations imposed. A court of equity, at the suit of private owners, will interpose to prevent a perversion of the trust by the agents or instrumentalities of the State, as it has done heretofore in the case of this park. In case public rights, only, are involved, it is through the instrumentality of the State, alone, that they can be vindicated. The Attorney General, State's attorney, city, park commissioners or other authorized agency of the State only can maintain a bill to enforce public rights in property held for the public use. (*Hill* v. *St. Louis and Northeastern Railway Co.* 243 Ill. 344; *Patterson* v. *Chicago, Danville and Vincennes Railroad Co.* 75 id. 588.) These cases involved the right of private individuals to enjoin the operation of a railroad in a public street without authority of law, but they are pertinent, for the title of the public to its streets does not differ from its title to its parks.

In *People* v. *Walsh*, 96 Ill. 232, we said (p. 249): "In cases of property dedicated to public uses there are most usually two classes of interests affected: one that of the public generally, and the other that of private parties. For any change of such a use, since the adoption of our present constitution, there can hardly be any doubt but that to the extent it damages the private individual he is entitled to

recover. But he may waive this right if he chooses. If he does not sue, it concerns neither other individuals nor the public at large. They cannot litigate for him, either in his own name or in the name of the public. This is so elementary and obvious that it needs no reference to authorities. But the legislature represents the public. So far as concerns the public it may authorize one use to-day and another and different use to-morrow. If the new use affects private rights, proceedings for condemnation may have to be invoked, but so far as it affects the public alone, its representative, in the absence of constitutional restraint, may do as it pleases."

As the grantee of the title, the State is bound by the terms of the instrument conferring title, and the legislature cannot change the uses and conditions upon which the property is held, because such change affects private rights. So far as such change affects public rights, only, the legislature may do as it pleases. It may change the use from time to time, as the public interests require, or may abandon the property altogether. (*City of Chicago* v. *Carpenter*, 201 Ill. 402; *Meyer* v. *Village of Teutopolis*, 131 id. 552; *People* v. *Kerr*, 27 N. Y. 188.) So far as the public interests are concerned, the legislature, or the South Park Commissioners, to whom the legislature has committed the control of the park, may authorize the erection of such appropriate buildings in the park as they think best. It is only because of the existence of private interests in the park, private easements appurtenant to other property to have the park remain free from buildings, that the legislature may not authorize the erection of buildings. Such private easements add to the value of the property to which they are appurtenant and themselves are private property. Like all other private property, they are subject to the power of eminent domain. The exercise of the right to take such property from its owners for the public use is not a change of the legal result of the acts of dedication or a violation of the

restrictions imposed by such acts. On the contrary, it is a recognition of the rights created by such acts and of the inviolability of such rights. It presupposes that these rights constitute property, which the legislature cannot destroy or impair.

The cases cited in the majority opinion, of *City of Alton* v. *Illinois Transportation Co.* 12 Ill. 38, *City of Jacksonville* v. *Jacksonville Railway Co.* 67 id. 540, *Village of Princeville* v. *Auten,* 77 id. 325, and *Village of Riverside* v. *MacLain,* 210 id. 308, are all based upon the proposition that the dedication of property to the public use is subject to such restrictions as may be imposed by the act of dedication. The first was an ejectment suit. In the others, injunctions were granted preventing the respective municipalities concerned from applying the property to uses other than those for which it was dedicated. In the last case it was said that it was not necessary to the maintenance of the bill that damages should be shown, but at the same time it was held that there was evidence of special damage and injury by the misuse of the park, and in the cases cited the facts were such as to show that damages would necessarily follow the perversion of the trust and use of the property in the manner threatened. It was also held that the evidence showed a threatened nuisance, that a special trust existed in respect to the park in favor of the complainants as adjoining property owners, and that a court of equity would interfere to prevent the perversion of a trust. The right of eminent domain was not considered or involved, for the village was not exercising or claiming such right but was claiming independently of it. These cases all depended upon contract rights created by dedication. They involved no question of the right of eminent domain, and contain no intimation that the State, by the acceptance of a dedication, deprived itself of the power to exercise such right or that by any contract it could do so.

248—21

To the suggestion that the appropriation of any part of the lands in Fort Dearborn addition to the erection of buildings would result in their reversion to the United States, the dedicator, it seems a sufficient answer that the Supreme Court of the United States has decided, in the case of *United States* v. *Illinois Central Railroad Co.* 154 U. S. 225, that the United States has no interest, legal or equitable, in the public ground in Fort Dearborn addition, no jurisdiction to control the trusts or uses created in such ground for the benefit of the public, and no right to enjoin the diversion of such public grounds from public purposes to private uses, and that this court has adopted that decision. *Williams* v. *City of Chicago,* 247 Ill. 240.

The right of eminent domain is an attribute of sovereignty, of which the State cannot divest itself. By no form of contract or legislative grant can the State surrender its right to take any property within the limits of the State at any time when it may be required for the public use. (*Village of Hyde Park* v. *Oakwoods Cemetery Ass'n,* 119 Ill. 141; *Sholl* v. *German Coal Co.* 118 id. 427.) In whatever grant or contract the State may make, there inheres the implied reservation of the right to re-take the property granted, or the subject matter of the contract, whenever the public necessities require it. Therefore a franchise granted for the erection of a bridge and the taking of tolls for passing over it, to continue for one hundred years, was held subject to be taken by the State for a public highway before the expiration of the hundred years by virtue of a statute enacted after the granting of the franchise. (*West River Bridge Co.* v. *Dix,* 6 How. 507.) A contract by a water company to supply a city with water for a term of years may be condemned by the city before its expiration, together with all the other property of the company. (*Long Island Water Supply Co.* v. *City of Brooklyn,* 166 U. S. 685.) By accepting the title to the park under the instruments of dedication, the State did not divest itself of the right to condemn the

private rights reserved by such instruments when needed for
the public use. Whether private rights are needed for the
public use, and the necessity of exercising the right of emi-
nent domain to acquire them, are political questions, which
belong exclusively to the legislative department of the gov-
ernment. *Chicago, Rock Island and Pacific Railroad Co.
v. Town of Lake,* 71 Ill. 333; *Schuster v. Sanitary District,*
177 id. 626.

It is necessary to bear in mind the two different rela-
tions which the State holds to this park and to distinguish
between its governmental and its contractual relation. The
distinction between the governmental functions of the State
and its proprietary rights and duties is well known. The
construction and obligation of its contracts are the same as
in the case of individuals. The same rights and liabilities
attach by reason of the ownership of private property,
though the remedies which exist against private citizens
for their torts and upon their contracts do not exist against
the State, because it cannot be sued. By the acceptance of
the dedication of the park the State became bound by the
restrictions imposed in the dedication. This obligation was
contractual, but the State did not, by its assent to the dedi-
cation, cease to represent the public in its governmental
capacity or deprive itself of any part of its powers of sov-
ereignty. The relation of the State to the park may be il-
lustrated by supposing the dedication to have vested the title
in a corporation authorized to hold it for the public in the
same way as the State holds it. The corporation trustee,
the private owners and the dedicator would then have the
whole title subject to the public use, and the State would
represent the public but would be under no contractual obli-
gation. Under such conditions, if the legislature should
think a necessity existed for taking a portion of the prop-
erty for the public use, no valid objection could be made to
its condemnation. The situation is not altered by the fact
that the State itself is both the trustee of the title by virtue

of the contract arising out of the dedication and its accept-
ance, and the representative of the public by virtue of its
governmental relation.   A contract cannot bind the State
not to exercise the power of eminent domain.   That con-
tract right is itself subject to the exercise of the power of
eminent domain.   The contract here is no more beyond
the exercise of the sovereign power to take it by eminent
domain than that in the case of *West River Bridge Co.* v.
*Dix, supra,* where the State was bound by a contract to
permit the bridge company to maintain its bridge and col-
lect tolls for a hundred years.   Yet the State there took
the bridge and the franchise though it had made an irre-
vocable grant, because in the judgment of the legislature
the public necessity required a free bridge.   It is true that
a lawful public use lies at the foundation of the right to
appropriate property, but if such lawful public use exists,
no contract not to apply the property to such use is of any
avail against the sovereign's power to so apply it on mak-
ing compensation for it.   The State may not violate its
contract, but, when the public necessity requires, it may
condemn the property rights growing out of such contract.
This unfettered exercise of the governmental power is es-
sential to the public welfare.   From time to time conditions
change in every community.   The necessity of to-day be-
comes useless to-morrow.   A new generation has needs
which its predecessors never imagined.   If the powers of
the government are to be limited and circumscribed, the
bonds imposed fetter its authority for all time.   A changed
situation may make the taking of particular property neces-
sary to the public good, but in all time to come it cannot
be taken, because the State has parted with a portion of its
sovereignty and bound itself by a contract not to exercise
its sovereign power.

This park extends along the lake front, in the heart of
Chicago, for nearly two miles.   When the dedication was
made Chicago was a village of a few hundred inhabitants.

Upon the theory announced in the majority opinion, if the dedication had contained the restriction that the park should forever remain free from use for any purpose of trade and that no roads should be constructed therein for general traffic or any other purpose than pleasure driving, and if afterwards docks and wharves had been built and a harbor developed and constructed opposite the park, no power would exist in the State to compel the construction of a street through this tract. The city might have grown and extended all around the park, but it would not have, and could not acquire, any access to its harbor through this two miles of territory, however necessary to the public welfare, on account of the progress and growth of the city, such access might be. If with a like restriction a park had been laid out for one or two miles along one or both banks of the Chicago river, it is apparent the public necessity for streets and bridge approaches would have been overwhelming, yet the State, having accepted the dedication, would have surrendered its sovereignty and no power would have existed to compel their construction. In 1836 the town of Chicago did not reach Park Row, the south boundary line of the park. If, instead of a tract extending two miles north from Park Row, the dedication had been of a tract at Park Row four hundred feet wide, extending from the lake two miles west, with a similar restriction to that just suggested, the city's growth could not have gone south of Twelfth street. There it would have met the barrier of the park, which no street could cross. If such a park had existed across the channel desired for the drainage canal of the sanitary district of Chicago, the canal could not have been constructed. These illustrations are extreme cases, but they are legitimate deductions from the theory of the majority opinion. If it be conceded that under any circumstances the public necessity would be such as to authorize the taking of the property in the exercise of the right of eminent domain the whole case is conceded, for, as is

stated in the majority opinion and held almost without exception, questions of the necessity and propriety of the exercise of the right are legislative and not judicial. Whether the use for which it is proposed to take private property is a public use is, however, a judicial question.

It is insisted that as the Field Museum of Natural History and the John Crerar Library are private corporations of a charitable nature, the use of the property intended is for a private charitable purpose and not public. The right of eminent domain may be exercised directly by the State but is usually exercised through the medium of a municipal corporation or a private corporation by virtue of a delegation of power. The right remains dormant until the conditions for its exercise have been prescribed by the legislature. The instrumentalities to which the power may be delegated are not limited to any particular class, so that the purpose is public. A common example of the exercise of the power by a private corporation is the taking of land by a railroad company for its right of way. In such case it is not even necessary that the corporation shall have been regularly organized but a *de facto* organization is sufficient. (*Ward* v. *Minnesota and Northwestern Railroad Co.* 119 Ill. 287.) The question to whom the power is granted is not material. The material question is whether the use is public. Decisions differ as to what constitutes a public use, but it is settled in this State that something more than a public benefit is required. There must be a right in the public to an actual use and not an incidental benefit, and the benefit resulting from a public use, capable of individual appropriation, must be open to all alike, upon the same terms and conditions. *Sholl* v. *German Coal Co. supra; Gaylord* v. *Sanitary District,* 204 Ill. 576.

The South Park Commissioners is a municipal corporation created for the management and control of the public parks within the towns of South Chicago, Hyde Park and Lake and having the power of eminent domain. By an act

of June 17, 1893, the corporate authorities having charge of any park were authorized to purchase or erect and maintain within such park, buildings to be used as museums for the collection and display of objects pertaining to natural history and the arts and sciences, to be open to the public free on two days each week and to school children at all times, with an admission fee for other days, regulated by statute, and required to be devoted to the maintenance of such museum. This act was amended May 14, 1903, so as to authorize the corporate authorities of the park to permit the directors of any museum of the character mentioned, to erect and maintain such museum in the park and to charge an admission fee within a fixed limit, the proceeds to be devoted exclusively to the maintenance of such museum, requiring the museum to be open to the public free three days in the week and to school children at all times. On the same day an act was passed authorizing the corporate authorities having control of any public park to permit any free public library organized under the act of June 17, 1891, to erect and maintain, at its own expense, its library building within the park, and to manage the affairs of such library so long as said library is maintained as a free public library, the same as if the said building were not in a public park. Each of these acts contained the provision, which has been already mentioned in regard to the condemnation of private easements, to have the park kept free from buildings.

The establishment and maintenance of free public libraries has been recognized as a public purpose, and many free public libraries and reading rooms have been established by the cities of this State and are now maintained by taxation under the act of March 7, 1872, which authorizes cities, incorporated towns and townships to establish and maintain free public libraries and reading rooms. A public museum of natural history, the arts and sciences is within the same category as a public library. Each is an institution for the promotion and advancement of knowledge; each is advan-

tageous to the public for its instruction and recreation. The legislature had the power to provide for the erection of a public library and a public museum. It was a legitimate exercise of power to grant to the corporate authorities of parks, authority to provide for the use of the public a library building or a museum building. It was within the power of the legislature to provide for the erection of such buildings by the park commissioners. It was not necessary, however, that the park commissioners should own the building or museum. If, by contract with the directors or trustees in control of the library and museum, the commissioners could procure the location of the library and the museum in the park, and thus secure for the public, permanently, the use of the library and the museum, there was no constitutional or legal objection to their doing so. Under the statute, by such location the library and museum will be devoted unreservedly to the public use, and every individual of the public will be admitted on the same terms to the free and unrestricted use of them as a matter of right, which cannot be denied but may be legally enforced. The fact that a fee may be charged on certain days for admission to the museum does not make the use private. It is not essential to the public use that it should be absolutely free to every one. Where there is cost in maintaining the service the State may demand compensation for the individual use. *Long Island Water Supply Co.* v. *City of Brooklyn, supra.*

It is said that the library and museum corporations are not authorized to exercise the power of eminent domain, and that the South Park Commissioners cannot exercise that power for the benefit of those corporations. In this connection the case of *Ligare* v. *City of Chicago,* 139 Ill. 46, is cited, as well as other cases following it. The point decided in those cases was, that a person or corporation having the power of eminent domain conferred by statute for a stated purpose may exercise it for that purpose and no other; that a railroad company, under authority to con-

demn property for its right of way, cannot condemn property for a street of a city, and a city, under authority to condemn property for streets, cannot condemn property for a railroad track, and that neither can condemn property ostensibly for the authorized purpose but really to be delivered to the other for its purpose. Here, however, the use is a public use, which the commissioners are authorized to supply and for which they are expressly authorized to exercise the power of eminent domain. It is immaterial what agency may be employed to serve the public purpose. A municipal corporation may exercise the power of eminent domain for a public purpose though that purpose is to be subserved or accomplished by another corporation or person. A city may condemn land for the purpose of supplying its citizens with water though it has contracted with a water-works company to construct and sell to it completed water-works, of which the land sought to be condemned is a necessary part. (*State* v. *City of Newark,* 54 N. J. L. 62.) The court said in that case: "The object of the condemnation is, and its effect will be, to vest the land in the city to be used for its water supply. For this purpose, and for this only, does the statute transfer the title to the city and authorize it to enter upon and take possession of the land. That the same purpose of obtaining a water supply is, in part, to be accomplished by a municipal power,—that of contracting with the water company,—does not seem to be a good reason for denying the right to exercise this power. Both powers are granted for the same end; both are convenient for attaining that end. It is reasonable that they should be exercised therefor conjointly as well as separately, if the conditions require it." In *Ten Broeck* v. *Sherrill,* 71 N. Y. 276, the canal commissioners were allowed to appropriate from contiguous property gravel for repairs though the work of repair had been let to a contractor, who was required to furnish the materials and was not otherwise able to fulfill his contract. A railroad company does

not lose its power to condemn lands for a right of way though the railroad, when constructed, is to be operated by a different corporation, and though the condemning company owns no rolling stock whatever and does not transport passengers or freight. (*Chicago and Western Indiana Railroad Co.* v. *Illinois Central Railroad Co.* 113 Ill. 156; *State* v. *Superior Court,* 31 Wash. 445.) In *Wisconsin River Improvement Co.* v. *Pier,* 137 Wis. 325, a corporation having the right of eminent domain, to be exercised in aid of navigation for the construction of a dam, contracted with a corporation organized to furnish power, but not having the right of eminent domain, for the construction of the dam at the sole expense of the latter corporation, in consideration of the receipt of all the profits arising from the sale of power generated by the dam. The first company then instituted a proceeding to acquire, by condemnation, the right to overflow the necessary land, and it was held that its right to exercise the power of eminent domain was not impaired.

The South Park Commissioners is authorized to furnish a site for a library or museum. The library and museum corporations are authorized to construct the buildings. The law authorizes the commissioners to contract with the corporations to erect buildings on the sites to be furnished by the commissioners. The purposes are public, and to acquire the right to furnish the sites so authorized to be furnished by the commissioners for such public uses, the commissioners may exercise the right of eminent domain though the buildings will be managed and the public use fulfilled through the instrumentality of the library and museum corporations. It was so held by the Supreme Court of Pennsylvania in *Laird* v. *City of Pittsburg,* 205 Pa. 1.

To the objection that the property proposed to be taken is already devoted to a public use, it may be answered that, even if this were true, the legislature may, so far as the public rights are concerned, change the use to which public

property is devoted.   So far as private rights are concerned, they may be taken in the exercise of the right of eminent domain, and the object of this proceeding is to ascertain the compensation to be made for the right so taken.   There is no rule of law, as counsel for the appellees contend, that property dedicated to public use cannot be condemned, even by legislative authority, for another public use of the same character or of a character no higher or more imperative.   Property in the control of one person or corporation devoted to a public use cannot be taken for the same public use from that person or corporation and turned over to another person or corporation by the legislature or any other authority.   But property devoted to public use is frequently condemned for another public use of the same character.   Railroads cross railroads and highways are laid out across railroads, and if the compensation cannot be agreed upon it is fixed by a proceeding in eminent domain. Clause 6 of section 19 of the general Railroad law authorizes any railroad company to cross the tracks of any other railroad company, and, if they cannot agree on the compensation therefor, provides that it shall be ascertained in the manner provided by law, which we have held to mean by a proceeding in eminent domain.   (*Chicago and Western Indiana Railroad Co. v. Illinois Central Railroad Co. supra; Lake Shore and Michigan Southern Railway Co. v. Chicago and Western Indiana Railroad Co.* 97 Ill. 506.)   In the latter case it is said (p. 515): "We find no want of constitutional power in the General Assembly to provide by law for the condemnation of a right of way for one railroad over another owned and operated by another railroad company. In so far as such property is to be regarded as public property or devoted to public use, the General Assembly may consent, in behalf of the public, that the character of the use may be so changed.   In so far as the private rights of the railroad company in such property are concerned, such rights, like other private property, are subject to the power

of the State to condemn and take the same for the new use
upon payment of just compensation." To the same effect
is *East St. Louis Connecting Railway Co.* v. *Union Railway
Co.* 108 Ill. 265. In this case, however, the property sought
to be appropriated was not devoted to the public use. It
was not sought to condemn that part of the territory within
the limits of the park on which it was proposed to erect the
buildings. The South Park Commissioners had sole charge
of that property, with the right, given by the act already
mentioned, to permit the erection of buildings on any part
of it, subject to the rights of the appellees and others sim-
ilarly situated. Their rights are private property. They
qualified the public use, but they are not themselves in any
sense devoted to the public use. It is private property, only,
which the appellant is seeking to condemn.

The contention that Grant Park is not a park within the
meaning of the acts of May 14, 1903, cannot be sustained.
It is not essential to the existence of a park that the public
should have control of it unrestricted by any condition
whatever. The language of the acts is general and applies
to any public park. The fact that each of the acts author-
izes the acquisition of easements of the character of those
held by appellees conclusively shows that they were not in-
tended to apply only to cases where no such easements
existed.

In an act dated February 18, 1861, amending the act
incorporating the city of Chicago, the legislature recognized
and expressly declared the rights of the owners of property
fronting on Michigan avenue to have the parks kept free
from encroachment by the use of the following language:
"The State of Illinois, by its canal commissioners, having
declared that the public grounds east of said lot should for-
ever remain vacant, neither the common council of the city
of Chicago nor any other authority shall ever have the
power to permit encroachments thereon without the assent
of all the persons owning lots or land on said street or ave-

nue." (Private Laws of 1861, sec. 64, p. 136.) It is insisted that this provision has never been repealed and is an obstacle to the exercise by the State of the right of eminent domain. This enactment had no effect upon the relations of the State, the city of Chicago and the owners of the property on Michigan avenue, to this park. Before that time their respective rights were fixed by the dedication. Without regard to this provision, neither the city nor the State, as we have three times held, could encroach upon the park by erecting any kind of building on it without the consent of every owner of property on the west side of Michigan avenue. The act does not, however, purport to limit the State in the exercise of its power of eminent domain, and if it had done so would have been unavailing for that, purpose. It recognizes the property rights of the lot owners and the power of the city to contract with them for the surrender of their easements. Until the legislature provided the method and declared the circumstances under which the right of eminent domain could be exercised there was no power to condemn. But the act of 1861 did not purport to limit the exercise of this right, and the legislature in 1903 provided the method for exercising it.

The case of *Village of Hyde Park* v. *Oakwoods Cemetery Ass'n,* 119 Ill. 141, is cited as controlling here. In that case the act under which the cemetery association was incorporated and authorized to hold property for burial purposes provided that streets should not be laid out or opened through said lands without the consent of the directors, nor should any corporation be authorized to take, hold or possess any portion of said cemetery, by condemnation, without such consent. It was held that the act of 1872, conferring upon cities and villages the general power to lay out streets within their corporate limits, did not repeal the special act whereby, within the village of Hyde Park, the association had been previously authorized to acquire certain lands for a public purpose and to hold them free from lia-

bility to be taken for streets by condemnation. The question was one of legislative intention and not of legislative power. Here there is no question of the intention of the legislature to confer upon the South Park Commissioners the powers in Grant Park mentioned in the act in question. In this case the special law merely recognized certain private rights and provided that they should be observed but did not declare that they might not be taken by condemnation. It is not inconsistent with the contract by which such rights were created to condemn them in the exercise of the right of eminent domain, and it is not inconsistent with the statute by which such rights were confirmed to precisely the same extent as they existed by virtue of the contract, to condemn them in the same way. Neither the city nor any other authority has now the power to permit encroachments on the park by buildings thereon without the assent of all owners of lots on Michigan avenue, but the right of such owners to object may be acquired by eminent domain, and the acquisition of such right to object is equivalent to obtaining their assent. Though the words of the acts are general and relate to any board of park commissioners and any public park, there is no doubt of the legislative intention to apply them to this particular park. The peculiar language conferring the right to condemn where any owner of abutting land or other person has "any right to have such public park, or any part thereof, remain open and vacant and free from any buildings," applies precisely to the unusual condition which exists in the case of this park and is conclusive of the legislative intention.

It is contended that the acts of May 14, 1903, are invalid because they impair the obligation of contracts, in violation of section 10 of article 1 of the Federal constitution; that the subjects of the act are not sufficiently expressed in the title and that each act embraces more than one subject, in violation of section 13 of article 4 of the State constitution; and that the acts constitute special legis-

lation, in violation of section 22 of article 4 of the State constitution.

The contracts the obligations of which are said to be violated are those claimed to have been created by the dedication and by the acts of 1861 and 1863. Whatever contract rights exist growing out of the dedication or those statutes are property rights, and are subject, as we have seen, to the exercise of the right of eminent domain. The obligation of such contracts is not impaired by taking them through the power of eminent domain. *West River Bridge Co.* v. *Dix, supra; Long Island Water Supply Co.* v. *City of Brooklyn, supra.*

The titles of the acts are general. They are, "An act to amend an act entitled 'An act concerning museums in public parks,' " and "An act concerning free public libraries in public parks." The generality of a title is no objection to it. If all the things authorized or required by the act to be done are reasonably included within the general subject expressed in the title and legitimately tend to effect the legislative purpose in regard to that subject, they are properly included in the act and the title is sufficiently expressed. (*People* v. *Sayer,* 246 Ill. 382; *People* v. *McBride,* 234 id. 146; *Meul* v. *People,* 198 id. 258; *Town of Manchester* v. *People,* 178 id. 285; *People* v. *Nelson,* 133 id. 565; *Blake* v. *People,* 109 id. 504.) An act concerning libraries in public parks may properly deal with the time, manner and circumstances under which they may be placed there; the regulation of the relations between the park authorities, the library authorities and the public; the rights of all persons interested in the park and in the library, and all things essential to a determination thereof. Each of these acts deals with the single subject, which was sufficiently expressed in the title.

It is said that the acts violate section 22 of article 4 of the State constitution because they grant special privileges to museum and library corporations and are restricted to

public parks where abutters have an easement to have them kept vacant. The latter part of the argument is inconsistent with the position taken that because Grant Park is such a park the acts do not apply to it, and it is also unfounded because the acts, in terms, apply to all public parks. The power to condemn private rights is, of course, restricted to cases where private rights exist. So far as the acts confer upon museum and library corporations privileges not conferred upon other private corporations or other charitable organizations, there are obvious differences between the character and purposes of such corporations and all other organizations which form a reasonable basis for the distinction between them and all other organizations and between one another. As to the question whether the Museum act violates this section of the constitution because applicable only to a museum located in a public park on July 1, 1903, no opinion is expressed, but the act of May 14, 1903, "concerning free public libraries in public parks," is in my judgment a valid enactment authorizing the South Park Commissioners to condemn the private rights mentioned in it.

Mr. JUSTICE HAND: I concur in the foregoing dissenting opinion of Mr. Justice Dunn.

Mr. JUSTICE CARTER, also dissenting:

I concur in the dissent of Mr. Justice Dunn, but the questions under discussion are so important that I desire to make a few additional suggestions.

I cannot see how the former decisions in the *Lake Front cases* that have been heretofore referred to control in any way the questions raised in this case. The doctrine of *res judicata* cannot apply here. The cause of action in the case now under consideration is not identical with but different from the causes of action in all of the former *Lake Front cases*. Those cases, therefore, are not conclusive in

this case as to what might have been decided but only as to the precise point actually decided in such cases. (*Cromwell* v. *County of Sac*, 94 U. S. 351; *Riverside Co.* v. *Townshend*, 120 Ill. 9; *Stone* v. *Salisbury*, 209 id. 56; *Cramer* v. *Wilson*, 202 id. 83; *Chicago Theological Seminary* v. *People*, 189 id. 439; *Leopold* v. *City of Chicago*, 150 id. 568; *Hanna* v. *Read*, 102 id. 596; *Merrifield* v. *Canal Comrs.* 212 id. 456; *Sawyer* v. *Nelson*, 160 id. 629.) The same rule of law was laid down in one of the *Lake Front cases.* (*Bliss* v. *Ward*, 198 Ill. 104.) It has frequently been held by this court that no estoppel arose from a former judgment where the causes of action were not identical and where the question was not actually decided in the former case. (*First Nat. Bank* v. *Leech*, 207 Ill. 215; *Gaffield* v *Plumber*, 175 id. 521.) From a consideration of the opinions in the former cases I am unable to see that what is there stated supports the statement in the majority opinion that the question here involved was intended to be decided in any of the so-called *Lake Front cases.* It is a familiar rule that the authority of judicial decisions arises from what the court decides in reference to the facts before it, rather than from what the judge who delivers the opinion may say in illustration or support of such ruling. *Bradley* v. *Lightcap*, 202 Ill. 154; *Cohens* v. *Virginia*, 6 Wheat. 399.

I wish to emphasize especially what is stated in Mr. Justice Dunn's dissent, that all private rights are held upon the implied condition that they may be re-taken by the sovereign. (*People* v. *Mayor of New York*, 32 Barb. 102; *Stevenson* v. *Loehr*, 57 Ill. 509.) I cannot agree with the conclusion of the majority opinion in this case that the public authorities had the right to accept the dedication of the Lake Front under such conditions that the legislature of this State would be deprived of the right to change the use of Grant Park if all the private rights affected thereby were first acquired and paid for through condemnation pro-

ceedings. Such acquiring of private rights under the sovereign power of eminent domain is no violation of the trust under which this park was accepted. There can be no violation of private rights in the exercise of the right of eminent domain. (*West River Bridge Co.* v. *Dix,* 6 How. 507; *R. F. & P. R. R. Co.* v. *L. R. R. Co.* 13 How. 71.) The legislature, by authorizing, under the act here in question, the change of use contemplated, did not violate public rights, because it represented the public. The majority opinion cites on this point *City of Jacksonville* v. *Jacksonville Railway Co.* 67 Ill. 540, *Village of Princeville* v. *Auten,* 77 id. 325, *City of Alton* v. *Illinois Transportation Co.* 12 id. 38, and *Village of Riverside* v. *MacLain,* 210 id. 308, among other cases, as holding that public authorities can not change the terms of a restricted dedication. In all those cases there was no prior exercise of the right of eminent domain. Those decisions fully supported the conclusions of this court in the former Lake Front decisions, but it seems clear to me that they are not in point on the question here under consideration, viz., that the use of public property can be changed by the proper public authorities after private rights have been acquired by condemnation. The reasoning of this court in many decisions leads to the opposite conclusion on this question from that reached by the majority opinion. (*Carter* v. *City of Chicago,* 57 Ill. 283; *People* v. *Walsh,* 96 id. 232; *Lake Shore and Michigan Southern Railway Co.* v. *Chicago and Western Indiana Railroad Co.* 97 id. 506; *Meyer* v. *Village of Teutopolis,* 131 id. 552; *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* 242 id. 30; *City of Chicago* v. *Carpenter,* 201 id. 402.) It would be contrary to the provisions of the constitution for the legislature to authorize the city authorities of any city to open and construct a street across private property without first having acquired the right so to do by purchase or condemnation. If this were attempted it could be enjoined under the authorities

cited in the majority opinion, but the decree in such injunction proceedings certainly would not be *res judicata* as to condemnation proceedings thereafter brought against the complainant (the owner of the land) in the injunction proceedings.

The question whether private property can be taken for public use by the exercise of eminent domain is a legislative one. The courts, in considering that power, are required only to decide, "Is the proposed use a public use?" "Has the power to condemn been delegated by the legislature?" "Is the act so delegating it in conformity with the constitution?" "Has the act been complied with?" I do not understand that the courts have ever claimed any general power to decide whether the use justifies the taking. The right of eminent domain is an attribute of sovereignty, of which the government cannot be deprived by grant or contract. Whatever exists in any form, whether tangible or intangible, may be subjected to the exercise of this power. Any contract or grant in restraint of the full exercise of this right is not obligatory upon the State and is unwarranted and void. The State is without power to divest itself of this right. (*Village of Hyde Park* v. *Oakwoods Cemetery Ass'n,* 119 Ill. 141; *Metropolitan City Railway Co.* v. *Chicago West Division Railway Co.* 87 id. 317; *Sholl* v. *German Coal Co.* 118 id. 427; *Offield* v. *N. Y., N. H. & H. Co.* 203 U. S. 372.) If the rule laid down in the majority opinion be followed to its logical conclusion, this transcendent power of eminent domain will be transferred from the legislative to the judicial branch of the government. The courts will then be compelled to decide in every case, not only that the use is a public one, which is being exercised under legislative authority and not in conflict with the constitution, but also that such public use is wise or necessary. Such a rule of law, in my judgment, is not only in conflict with the authorities on this subject, but also with sound public policy.