A. MONTGOMERY WARD, Appellant, *vs.* FIELD MUSEUM OF NATURAL HISTORY *et al.* Appellees.—SOUTH PARK COMMISSIONERS, Appellant, *vs.* A. MONTGOMERY WARD : *et al.* Appellees.

*Opinion filed October 26, 1909.*

1. PARKS—*dedication of park for particular purpose cannot be changed by city or legislature.* Where a park has been dedicated by the owners of the land for a particular purpose, neither the city which has charge of the park nor the legislature can change the legal result of the act of dedication or divert the park from the original purpose.

2. MUNICIPAL CORPORATIONS—*cities and park boards are creatures of the legislature.* Cities and park boards are creatures of the legislature for the purpose of administering certain functions of local government within specified territory, and the legislature has full power to transfer the control of property held by them for public use from one to the other, or to any other agency created for the purpose of exercising governmental powers.

3. SAME—*power of the legislature over municipal corporations.* Subject to the limitation of the constitution relating to local or special legislation, municipal corporations, which are purely of legislative creation for the purpose of local government, may ·be

changed, modified, enlarged, restrained or abolished by the legislature to suit the exigencies of the case, and the powers and duties with which they are invested may be imposed upon others.

4. RES JUDICATA—*judgments of Supreme Court against agency of State are res judicata. as to successive agencies.* The judgments of the Supreme Court against the city of Chicago in *City of Chicago* v. *Ward,* 169 Ill. 392, and against the State of Illinois, represented by the board of commissioners of lake front armory, in *Bliss* v. *Ward,* 198 Ill. 104, are binding upon all citizens of the city and upon the State and all its subordinate agencies having successive relationship, under legislative control, to the same rights of property, including the South Park board and those claiming under it by contract. (*C., B. & Q. R. R. Co.* v. *Lee,* 87 Ill. 454, explained.)

5. DEDICATION—*when reclaimed land is subject to the terms of original dedication.* The land reclaimed by the city of Chicago by filling Lake Michigan east of the Illinois Central Railroad Company's right of way in Chicago between Randolph street and Park Row is subject to the same restriction against building as was imposed by the original dedication of the land west of such right of way in both the Fort Dearborn and the canal commissioners' subdivisions, and such restriction prohibits buildings of any kind.

APPEALS from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

GEORGE P. MERRICK, (ELBRIDGE HANECY, of counsel,) for A. Montgomery Ward.

HOLLETT, SAUTER & HENKEL, (R. P. HOLLETT, and L. E. SAUTER, of counsel,) for the South Park Commissioners.

EDWIN WALKER, and WINSTON, PAYNE, STRAWN & SHAW, (JOHN BARTON PAYNE, JOHN S. MILLER, and WALTER H. JACOBS, of counsel,) for the Field Museum.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

This suit is a renewal of a controversy of long standing between A. Montgomery Ward and the public authorities having the control and management of what is now known

as Grant Park, in the city of Chicago, concerning the right of Ward to have the park kept free from public buildings, which was adjudicated between him and the city in the case of *City of Chicago* v. *Ward,* 169 Ill. 392, and again between him and commissioners of the State in *Bliss* v. *Ward,* 198 Ill. 104. The history of Grant Park and the material facts governing the rights of the parties were recited at length in the opinions of the court in those cases, but for the purpose of a clear understanding of the questions involved and decided it is considered proper to bring all the facts together in this opinion.

The Congress of the United States, by an act approved March 2, 1827, granted to the State of Illinois certain lands for the purpose of aiding in opening a canal to connect the waters of the Illinois river with those of Lake Michigan. The State was authorized to sell and convey the whole or any part of the land and give title in fee simple therefor. By an act of the legislature of January 22, 1829, provision was made for the appointment of commissioners to sell the lands, and by act of February 15, 1831, the commissioners were constituted a board, to be known as "Board of Canal Commissioners of the Illinois and Michigan Canal." A selection of lands was made by the commissioners, and on May 21, 1830, was approved by the President, and among the lands so selected was fractional section 15, in which that part of Grant Park south of the center of Madison street extended east is located. By an act approved January 9, 1836, the board of canal commissioners were directed to proceed to sell certain lots, including said section, which was first to be laid off into town lots, streets and alleys, as in the judgment of the commissioners would best promote the interest of the canal fund. The commissioners made a subdivision containing two tiers of eleven blocks each, bounded on the west by State street, on the north by the center line of Madison street, on the south by the center line of Twelfth street and on the east by Lake Michigan, with streets and

alleys, and the plat was acknowledged and recorded July 20, 1836. The open space between the east line of the eastern tier of blocks and the lake, as far south as block 23, now known at Park Row, was left unsubdivided and vacant. At the north line of the section this space was about five hundred feet wide and at Park Row it was about seven hundred feet wide, and that space was marked with the words "Michigan avenue," which, so far as the plat went, indicated the use of the whole space as an avenue. The commissioners prepared plats or sketches for the purposes of sales and distributed them to the public and prospective bidders, and on these plats or sketches the open space was marked "Open ground—no building," or equivalent words indicating that it was to be kept open and clear of any buildings. The lots were sold with reference to such plat or sketch, and they sold at a higher price on account of the eastern exposure to the lake and restriction as to buildings.

When the canal commissioners' subdivision was laid out, the south-west fractional quarter of section 10 lying north of it was owned by the United States and occupied for a military post as Fort Dearborn reservation, and had been so occupied as early as 1804. In the year 1839 it was subdivided, under authority of the Secretary of War, into blocks, lots, streets and public grounds, as Fort Dearborn addition. On the plat an open space was reserved for public grounds east of Michigan avenue between Randolph and Madison streets, fronting on Lake Michigan, and marked on the plat, "Public ground forever to remain vacant of buildings." The acknowledgment of the plat contained the following: "The public ground between Randolph and Madison streets, and fronting upon Lake Michigan, is not to be occupied with buildings of any description." Ward owns lots and buildings fronting on Michigan avenue between Washington and Madison streets. In 1844 the city council accepted the public ground by a resolution that all that part of Michigan avenue lying east of a line ninety feet

east of the east tier of blocks of section 15 should be en-
closed as a public ground, and all that part of said avenue
in the Fort Dearborn addition lying east of a line drawn
south from the south-west corner of land belonging to the
estate of John Wright and occupied by Mr. Lamb should
be enclosed as a public park, at the expense of the subscrib-
ers to such enclosure. The land belonging to the estate of
Wright was at the north-east corner of Michigan avenue
and Randolph street. This resolution limited the use of the
space for street purposes to ninety feet and accepted the re-
mainder as a public park, and that division has always been
acquiesced in. The width of the park was reduced, after
the dedications, by encroachments of the lake.

In 1852 the Illinois Central Railroad Company, under
authority from the State and an ordinance of the city, lo-
cated its railroad in Lake Michigan over submerged lands in
front of the then existing park, and laid its tracks on piles
driven in the bed of the lake and built a breakwater to pro-
tect the same. The legislature, by an act of February 18,
1861, amending the act incorporating the city of Chicago,
prohibited the railroad company from encroaching upon the
land or water west of a line not less than four hundred feet
east of the west line of Michigan avenue and prohibited the
city from allowing any encroachment west of that line. It
provided that any person being the owner or interested in
any lot fronting on Michigan avenue should have the right
to enjoin said company, and all other persons and corpora-
tions, from any violation of the provisions of the act. It
contained this confirmation of the representations of the
canal commissioners: "The State of Illinois, by its canal
commissioners, having declared that the public ground east
of said lots should forever remain open and vacant, neither
the common council of the city of Chicago nor any other
authority shall ever have the power to permit encroach-
ments thereon without the assent of all persons owning lots
or land on said street or avenue." The railroad company

filled up its right of way, which by the ordinance was three hundred feet wide, and the bed of the lake was gradually filled from the shore by the deposit of waste and rubbish. At the time of the great fire of 1871 there was still a basin there, used for row boats and sail boats. The dumping of debris finally filled the space west of the railroad right of way, and disputes arose as to the titles of the railroad company, the city and the State in the made lands and submerged lands to the east. Those disputes were all finally and conclusively settled by a suit commenced March 1, 1883, in the name of the People of this State against the railroad company and the city, in which the city filed a cross-bill and which was finally decided by the Supreme Court of the United States in 1892. The court stated that the object of the suit was to obtain a judicial determination of the title of the lands on the east or lake front, between the Chicago river and Sixteenth street, which had been reclaimed from the waters of the lake and were occupied by the tracks and structures of the railroad company, and the title claimed by said company to the submerged lands constituting the bed of the lake lying east of its tracks, within the corporate limits, for the distance of one mile. The city by its cross-bill claimed the ownership in fee of the public grounds on the east front of the city bordering on the lake, contained in the two subdivisions above mentioned, and asked a decree declaring that it was such owner in fee and of the riparian rights thereunto appertaining, and the right to develop the harbor of Chicago by the construction of docks, wharfs and levees. The Supreme Court decided that the city, as riparian owner between the north line of Randolph street and the north line of block 23 extended to Lake Michigan, which is now Grant Park, had power to construct and keep in repair on the lake front, east of the premises, landing places, wharfs, docks and levees, subject, however, to the authority of the State and the supervision and control of the United States. The court confirmed the title in

the city to the lands which had been filled beyond the original shore line and reclaimed from the waters of the lake and also to the lands filled and occupied by the railroad company, subject only to the use thereof for right of way and railroad purposes. It was decided that the railroad company had a perpetual right of way over the ground for the tracks of its railway and the continuance of the breakwater as a protection to its property and the shore from the violence of the lake. This carried the title of the city eastward as far as the lake had been filled. The court adjudged that the State was the owner in fee of the submerged lands constituting the bed of the lake east of the railroad tracks, but with a title different in character from that which it held in lands intended for sale; that the title so held was in trust for the people of the State, that they might enjoy the navigation of the waters, carry on commerce over them and have liberty of fishing therein free from the obstruction or interference of private parties, and that the interest of the people in navigation and commerce might be improved by the erection of wharfs, docks and piers, for which purpose the State might grant parcels of the submerged lands. The State did not afterward grant or appropriate the submerged lands in the present limits of the park for wharfs, docks, piers or other uses promoting navigation or attempt to apply them to any such use, but permitted the city, as riparian owner, to continue to add to the park by filling and recognized the reclaimed lands as a part of the park. The character of such reclaimed lands as a public park is not questioned.

During the pendency of that suit in the Federal courts the city of Chicago authorized and permitted the erection of buildings and obstructions on the public grounds in front of Ward's property, and in 1890 he filed a bill in the superior court of Cook county to enjoin the city from violating the terms of the dedication in the Fort Dearborn addition. In 1896 his bill was amended by setting out the

history of the platting of the two additions and the dedica-
tions therein contained, the acceptance by the city by the
resolution of April 29, 1844, and the designation of the
ground by the city as Lake Park by an ordinance of Au-
gust 10, 1847, and seeking a permanent injunction against
the construction of buildings thereon and diverting the park
from the purposes for which it was dedicated. A final de-
cree was entered in that case restraining the city from erect-
ing or causing to be erected any building or structure upon
the premises described in the bill, to-wit, "that tract of land
lying between Randolph street on the north and Park Row
on the south and between the west line of Michigan avenue
and the west line of the right of way and grounds of the
Illinois Central Railroad Company," excepting the Art In-
stitute, a temporary post-office until a permanent one should
be completed, and armory buildings, for a period of three
months. The city sued out a writ of error from this court
to review that decree, and this court affirmed it in *City of
Chicago* v. *Ward, supra,* holding that the dedications of the
land were in trust for the public, not to be occupied with
buildings, and that abutting owners had a right to have the
park maintained in accordance with the terms of the origi-
nal dedication.

On July 27, 1896, an ordinance of the city was passed
giving consent to the South Park Commissioners to take,
regulate, control and govern the park, except that portion
lying north of the north line of Jackson street extended east
to the railroad right of way, including land which might be
thereafter reclaimed adjoining said park, reserving to the
Field Columbian Museum the right to construct its build-
ings on a parcel of land 1300 feet in length by 900 feet in
width, the west line to be 225 feet east of the railroad right
of way, and also all that portion east of the right of way
and north of the north line of Monroe street extended east
to the outer sea wall, which was dedicated as a site for an
armory and parade ground by the local military companies

of the Illinois National Guard. The park commissioners accepted the park as turned over to them, by a resolution adopted October 14, 1896. The legislature passed an act approved June 11, 1897, reciting the passage of the ordinance and enacting that a board of commissioners should be appointed for the purpose of planning and constructing a parade ground and armory on that part of the park reserved by the city for that purpose. The buildings were to remain the property of the State, and the city was required to enter into a contract that the right of the State to the use and occupation of the land should be perpetual and the title should be and remain in the State. The city entered into the required agreement, and the legislature passed an act approved April 22, 1899, making a further appropriation for the expenses of forming the parade ground and building the armory. The commissioners proceeded under the act, and Ward filed his bill in the circuit court of Cook county to enjoin them from constructing or erecting any building or other structure on that part of the park lying east of the railroad right of way bounded on the north by the south line of Randolph street extended east, on the south by the north line of Monroe street extended east, which included land in the canal commissioners' subdivision, and on the east by the harbor line. That suit involved both subdivisions and related to land east of the railroad right of way. The relief prayed for was granted, and this court affirmed the decree in *Bliss* v. *Ward, supra.* It was held that inasmuch as the city had been permitted, as riparian owner of the lands extending to the east line of the railroad right of way, to enlarge the park by filling in the shoal waters, the extension grew upon the original park as a part of it, the same as if by the process of natural accretions. The legislature expressly approved the filling and reclamation of the lands, and by an act approved April 24, 1899, recited that the title to the land, a part of which was yet submerged but the reclamation of which was contemplated

and being then undertaken by the filling of the shore line, was still, as the legislature believed, in the State, and enacted that the park should be called Grant Park. That act was amended in 1901, designating the land and submerged land north of Monroe street extended east as Grant Park and conveying to the park commissioners that part south of the north line of Jackson street. By an act approved May 14, 1903, the whole of Grant Park, bounded on the north by the south line of Randolph street extended east to the harbor line and south by the south line of Park Row extended east to said harbor line, was conveyed to the South Park Commissioners, to be held, managed and controlled by said commissioners as other parks then under their control. The legislature passed another act in force July 1, 1903, giving the corporate authorities of park districts power to erect and maintain museums within any park, and to permit the directors or trustees of any museum to erect the same in any park and to charge an admission fee, except on certain days named.

On July 20, 1903, an ordinance of the city was passed giving permission to the park commissioners to take the control of all that portion of the park lying west of the Illinois Central right of way and north of the north line of Jackson street extended east, subject to the rights of the Art Institute, the right of the John Crerar library under an ordinance authorizing the erection and maintenance of said library in the park, a reservation of so much of the park as the city council might deem necessary to construct and maintain a city hall, and the reservation of a right to place and maintain on the park a bowlder twenty-five feet square as a monument to Dr. Samuel Guthrie, inventor of chloroform. In the year 1906 an attempt was made to build the Crerar library in the park but was prevented by contempt proceedings. Marshall Field died in 1906 and by his will left $8,000,000 to the Field Museum, and the building was to be erected upon a site to be furnished. Those who were

interested in the museum and seeking a free site selected a location in the park, and the board of commissioners entered into a contract with the museum by which the building was to be erected, 1300 feet in length north and south and 800 feet in width east and west, east of the Illinois Central right of way, with the center opposite Congress street extended east. The third bill for the protection of his rights to have the park kept free from building was filed by Ward in this case in the superior court of Cook county against the Field Museum of Natural History, a corporation about to construct the museum, and the South Park Commissioners, a municipal corporation having charge and control of the park, praying for an injunction restraining the construction and erection of said building or any building impairing or obstructing his easement under the dedications by the State of Illinois and the government of the United States. The bill set out the previous suits and proceedings in connection with the facts. The museum and park commissioners answered separately, disputing the right claimed, and the park commissioners filed a cross-bill praying that Ward be enjoined from asserting any easement over Grant Park or interfering in any way with the erection by said commissioners or the Field Museum of said building or other buildings alleged to be proper in a public park. To the cross-bill Ward filed a plea in bar, setting up the previous decrees against the predecessors in right and title of the South Park Commissioners. Nothing appears to have been done with the plea. Ward also answered the cross-bill, again setting up his rights, and replications having been filed, the cause was heard by a chancellor of the superior court. The chancellor by his decree found that the erection of the museum was a proper use of a park, and divided the park into two parts, decreeing that as to the portion lying east of the railroad right of way the park commissioners had a right to erect and maintain all proper park buildings and to permit the erection and maintenance therein of the museum, but

that the commissioners had no right to erect or maintain any building west of said right of way. Ward was restrained from interfering with the erection of park buildings and the museum east of the right of way. The park commissioners and Ward severally prayed appeals from the decree, and the court certified that the validity of certain municipal ordinances was involved and the public interest required the case to be taken directly to this court.

There is no basis for a division of the park into two sections, one west of the railroad right of way and the other east of it, and that question was settled in *Bliss* v. *Ward, supra.* The commissioners of the State in that case contended that the decision in *City of Chicago* v. *Ward, supra,* fixed and determined the limits of the ground to which the building restriction extended and confined the same to the lands west of the railroad track, but their claim was held to be unfounded. The first case related to that part of the park west of the right of way, the title of which was in the city in trust for the public for the uses of a park, and the title to the submerged lands east of the right of way was in the State of Illinois in trust for purposes of navigation and fishing. In the second case it was held that the extension of the park over the submerged lands, whether by natural accretions or artificial means, carried with it the same restrictions against buildings. None of the parties in this case rely upon any distinction or division of that kind, but the substance of the argument is, that there is no restriction against such buildings as are proper to be placed in a public park, and that the question whether there is any restriction against such buildings has never been decided.

Questions concerning the proper uses of public parks and what buildings may be erected in parks or have been erected in other parks are not involved in this case. The claim of Ward is, and has been, that by virtue of the original dedication of Fort Dearborn addition the public ground east of Michigan avenue is forever to remain vacant of

buildings, and that the sales by the canal commissioners of lots in their subdivision, upon a representation that the open space east of the west line of Michigan avenue should be open ground with no building, prevents the construction of any building for any purpose. The nature or use of a building is not material, and counsel are in error in their view that the question whether buildings may be erected in this park has not been decided. Although the doctrine of *res judicata* embraces not only what has been actually determined in the former suit but also extends to any other matter which might have been raised and determined in it, (*Harvey* v. *Aurora and Geneva Railway Co.* 186 Ill. 283,) the identical question in this case was decided in the former suits. Where a park has been dedicated for a particular purpose, the municipality having it in charge cannot divert it from that purpose. (*Village of Riverside* v. *Mc-Lain,* 210 Ill. 308.) And in *City of Chicago* v. *Ward, supra,* the court held that it was beyond the power of the legislature to change the legal result of the acts of dedication. The city and the South Park Commissioners are creatures of the legislature for the purposes of administering certain functions of local government within specified territory. (*People* v. *Walsh,* 96 Ill. 232; *West Chicago Park Comrs.* v. *City of Chicago,* 152 id. 392.) "The city of Chicago, to the extent of the jurisdiction delegated to it by its charter, is but an effluence from the sovereignty of Illinois, governs for Illinois, and its authorized legislation and local administration of law are legislation and local administration by Illinois through the agency of that municipality." (*Byrne* v. *Chicago General Railway Co.* 169 Ill. 75, on p. 85.) The city held, and the park commissioners now hold, the park in the exercise of governmental powers in trust for the public. Such corporations, being purely of legislative creation for local government, the legislature may control and dispose of their property as shall appear to be best for the public. The legislature may create, an-

nul and change municipal corporations and control and dis-
pose of their property, subject only to the constitutional
provision relating to local or special legislation. Subject
to that condition they may be changed, modified, enlarged,
restrained or abolished to suit the exigencies of the case,
and the powers and duties with which they are invested may
be imposed upon others. (*Wilson* v. *Board of Trustees,*
133 Ill. 443; *Town of Cicero* v. *City of Chicago,* 182 id.
301; *City of Chicago* v. *Town of Cicero,* 210 id. 290; *Peo-
ple* v. *Walsh, supra.*) The only right which the South Park
Commissioners have is derived from the city and acts of
the legislature and the only right of the Field Museum is
under the contract with the park commissioners. The judg-
ments of this court against the city and the State are
therefore binding and conclusive upon both the park com-
missioners and the Field Museum. The judgment against
the city concerning the land west of the right of way was
binding upon all the citizens of the municipality and upon
the State. (*Harmon* v. *Auditor of Public Accounts,* 123
Ill. 122; *Griffith* v. *Vicksburg Water-works Co.* 8 Am. &
Eng. Ann. Cas. 1130; 24 Am. & Eng. Ency. of Law,—
2d ed.—755.) The judgment against the commissioners of
the State that the restriction extended to the reclaimed land
beyond the right of way was conclusive not only against
the State but all its subordinate agencies having succes-
sive relationship, under legislative control, to the same
rights of property; (23 Cyc. 1215;) and in that case the
commissioners not only claimed in the right of the State,
but under an ordinance of the city. To permit each suc-
cessive agency to which the legislature may transfer the
management and control of the park to litigate the ques-
tion once finally and conclusively determined against the
State and the agency in control of the park at the time of
the adjudication would be intolerable and contrary to es-
tablished rules of law.

Counsel cite and quote from *Chicago, Burlington and Quincy Railroad Co.* v. *Lee,* 87 Ill. 454, to sustain the argument that the former judgments are not *res judicata* of their present claim that all buildings proper for a park may be erected in this park. That, like other cases announcing the same doctrine, was an action at law where there was a trial by jury and the judgment was reversed and the cause remanded with an order for a *venire de novo.* There was no final judgment in this court, and, as a matter of course, the second appeal was to be decided on the evidence produced at the second trial.

There was testimony that certain structures are absolutely necessary for the comfort of the public and the proper use of the park, but most of them, such as shelters in case of storms, band stands, lavatories, toilets and the like, can be provided without the erection of what would properly be characterized as a building. There is no necessity for locating power houses, stables or things of that kind above the surface of the ground; but whatever the result may be, neither the legislature nor any municipal corporation under the authority of the legislature can violate the restriction imposed in the dedication of the property. The question in the former cases was not whether park buildings, museums or any particular kind of building could be. erected on the premises, but whether a building of any kind could be so erected, and the argument which is renewed in this case, that Ward's rights extend only to the Fort Dearborn addition, was directly answered in the first case.

The decree of the superior court is reversed and the cause is remanded to that court, with directions to enter a decree dismissing the cross-bill for want of equity and granting the prayer of the original bill.

*Reversed and remanded, with directions.*