Stevens Hotel Company, Appellee, v. The Art Institute of Chicago and South Park Commissioners, Appellants.

Gen. No. 34,885.

Heard in the first division of this court for the first district at the June term, 1930. Opinion filed March 23, 1931. Rehearing denied April 6, 1931.

CUTTING, MOORE & SIDLEY and WEST & ECKHART, for appellant Art Institute of Chicago.

GEORGE E. GORMAN, for appellant South Park Commissioners; NATHAN G. MOORE, HORACE KENT TENNEY and PERCY B. ECKHART, of counsel.

GEORGE P. MERRICK and HUGH T. MARTIN, for appellee.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

This appeal is from a decree by which the Art Institute and the South Park Commissioners and all persons claiming through or under them were permanently enjoined "from constructing or continuing to construct, erecting or continuing to erect, causing or permitting or suffering to be erected or constructed or placed thereon, any building or other structure or obstructions of any kind, nature or description whatever, anywhere within the limits of . . . Lake Park, or Grant Park, or Lake Front Park," in the City of Chicago. The decree further adjudged that complainant had a perpetual vested right to prevent the erection of buildings upon Grant Park and every part of it and the right to forever restrain and prevent the erection, construction or placing of any building, structure or obstruction thereon and to have this tract of land forever remain public ground as an open park vacant of buildings, structures or obstructions of any kind, and that this right "descends and extends to its assigns, representatives and grantees forever."

From this decree the Art Institute and Park Commissioners prayed and were allowed an appeal to the Supreme Court of Illinois. That court held that it was without jurisdiction and transferred the cause to this court. *Stevens Hotel Co. v. Art Institute,* 342 Ill. 180.

Grant Park is a tract of land which covers little more than 303 acres situated in the heart of Chicago. It is bounded on the north by Randolph Street, on the east by Lake Michigan, on the south by Park Row, on the west by a line running north and south 90 feet east of the west line of Michigan Avenue. The title thereto and the rights of the public and of abut-

ting property owners therein have for more than half a century been the subject of frequent litigation in the courts of this State and of the United States. The right of way of the Illinois Central Railroad passes through and over Grant Park in a north and south direction, and the rights of that road, of the City of Chicago and of the State of Illinois in and to this land were determined in the case of *Illinois Cent. R. Co. v. People,* 146 U. S. 387. The history of the title to this tract of land is set forth at length in the opinion filed in that case from the time that the north end of it was occupied by the government of the United States as a military site. At that time the shore of Lake Michigan in a general way was along the line of what is now Michigan Avenue, and when later the land fronting east on Michigan Avenue was subdivided this tract between that avenue and the lake was dedicated to a public use to the end that it should at all times be kept clear of any buildings or structures whatsoever. By this original dedication, by ordinances of the City of Chicago and by repeated decisions of the courts construing these, it has been determined that the owners of the property abutting on Michigan Avenue to the west have acquired a perpetual easement over this tract of land and a vested right to have the same kept free from buildings, structures and obstructions of every kind and character, and that this easement extends to land created either by avulsion or accretion. *City of Chicago v. Ward,* 169 Ill. 392; *Bliss v. Ward,* 198 Ill. 104; *Ward v. Field Museum,* 241 Ill. 496. In *South Park Commissioners v. Montgomery Ward & Co.,* 248 Ill. 299, it was held that the right of the abutting property owners to have Grant Park remain free from buildings was more than a mere property right which could be compensated for in damages and that an attempt to take away this easement of these owners by exercise of the right of eminent domain was illegal. In *McCormick v. Chicago Yacht Club,* 331 Ill. 514, it

was held that the erection of a clubhouse beyond the harbor line, as established by the Secretary of War in 1921 on submerged land formerly owned by the State was not an erection of a building in the dedicated park, and an injunction was refused upon that ground. This case seems to have been followed in *Stevens Hotel Co. v. Chicago Yacht Club,* 339 Ill. 463, but both these decisions are placed upon the ground that the building was erected upon submerged land which was outside the limits of the park and over which the Park Commissioners had no jurisdiction. The right, therefore, of abutting property owners to have this tract of land kept free and clear of buildings would seem to be finally determined, if it may be properly said that any legal question ever can be so determined.

The bill in this case was filed February 8, 1929, and prayed an injunction as afterwards granted. It was later amended by proper averments so as to allege that the contract of January 18, 1928, between the Art Institute and the South Park Commissioners constituted a violation of the rights of complainant under the Constitution of the United States, in that it would impair the obligation of a contract and deprive complainant of its property without due process of law and also was a violation of separate section 2 of the Constitution of Illinois, which provided in substance that no municipality should subscribe to the capital stock of any railroad or private corporation or make a donation or loan to its credit in aid of such corporation.

The bill alleged that by the contract of January 18, 1928, leave was given the Art Institute to use other tracts of land for erection thereon of additions to the building of the Art Institute, contrary to complainant's rights under its easement. Defendants in their answers admitted the execution of this contract, claimed the right to do so and submitted a proposed plan for the enlargement of the Institute in conformity therewith. A plat showing the present location of the Art In-

stitute, the land now occupied by it, and the proposed additional grants appears on the opposite page.

Since it is apparent that the proposed additions are to be erected on Grant Park, all of which was originally subject to the rights of complainant under the easement as above described, the conclusion of the trial court would seem to be unavoidable, unless the rights of complainant have been modified by some agreement to the contrary, either express or implied, or unless by some act or conduct of complainant or of its predecessors in title, complainant is precluded from asserting these rights, or unless there has been some adjudication by the courts to the contrary. Defendants contend that there was such consent and agreement; that by the conduct hereinafter set forth complainant is precluded and estopped, and that it has been so adjudged by the courts.

In this connection it may be well to recite some material and undisputed facts. Defendant Art Institute of Chicago is a corporation, not for pecuniary profit, organized under the laws of the State of Illinois. Its only place of business is in Chicago, Cook county, Illinois. Its original name was ''The Chicago Academy of Fine Arts.'' It was organized May 22, 1879, for the object, as stated in its articles of incorporation, ''the founding and maintenance of schools of Art of design, the formation and exhibition of collections of Objects of Art and the cultivation and extension of the Arts of design by any appropriate means.'' On November 25, 1925, by amendment to its articles the objects were enlarged.

In 1893 the Art Institute enrolled 947 students and employed a faculty of 21 instructors and operated its school at an annual expense of $20,800. At that time its membership was 2,149. Its annual attendance of visitors numbered 215,600. It owned art objects of the value of $187,488.67 and held in trust endowment funds to the amount of $1,500. In that year the population

# PLAN of DEVELOPMENT
## ·ART INSTITUTE of CHICAGO·
Scale

WEST DRIVE

STREET

Center line of Street

Center line of Street

I C R R R

MONROE

JACKSON BOULEVARD

217,905 ♯ — PRESENT BUILDINGS
74,755 ♯ — PROPOSED ENLARGEMENTS ON OCCUPIED AREAS
94,900 ♯ — PROPOSED ENLARGEMENTS ON UNOCCUPIED AREAS

MICHIGAN AVENUE

ADAMS ST

of Chicago was 1,438,010 and the pupils enrolled in the public schools of Chicago at that time numbered 166,895. The public schools of the city then employed a teaching staff of 3,523 instructors. A permanent and suitable location for the Art Institute (it is conceded) had become imperative as early as 1891.

March 30th of that year the city council of the City of Chicago, the predecessor in title of the South Park Commissioners, passed an ordinance which recited that the World's Columbian Exposition was desirous of erecting an art building on the Lake front and that the Institute and many of its students desired that the building so erected should become "*a permanent building,*" the use of which should be given to the Art Institute after the Exposition had been held. The ordinance recited that those interested had offered to contribute a large sum of money to the end that the building should be suitable "for the *permanent accommodation* of the said Art Institute." The ordinance further recited that "to secure the erection of said *permanent building*" it was necessary action should be taken "granting the right to use said building to the said Art Institute." It was therefore ordained that after the time limited for the use thereof by the Exposition, the title and ownership of the building "and all the appurtenances thereto, shall be vested in the City of Chicago . . . but the right to the use and occupation of said building, *and of the grounds appurtenant thereto and necessary for the reasonable enjoyment thereof, shall be vested in the Art Institute of Chicago,* a corporation organized under the laws of the State of Illinois, for the objects for which said Art Institute is incorporated, so long as said Art Institute shall faithfully keep, perform and observe the provisions and conditions of this ordinance hereinafter contained, or until the said building and premises shall be voluntarily surrendered by the said Art Institute to the City of Chicago under the conditions aforesaid, the

said use of said building being granted to the said Art Institute upon the following conditions. . . .

These conditions were stated to be that as soon as practicable after the surrender of the possession of the building by the Exposition, the Art Institute should transfer to, place and arrange in the building its museum, library and collections, or such portions thereof as could be properly displayed to the public therein; that the exhibition halls of the building should upon certain days and under certain rules and regula- tions be kept open and accessible to the public, free of charge; that all professors and teachers of the pub- lic schools of Chicago, or of other institutions of learn- ing in the city, should be admitted to the advantages offered by the Art Institute; that the Art Institute should each year submit to the City of Chicago a re- port of its operations, transactions, receipts, payments, etc., and that if the Art Institute at any time desired to surrender possession of the building it should give the city not less than three months' notice; that the by-laws of the Institute should be amended so as to make the mayor and the comptroller of the City of Chicago *ex officio* members of the board of trustees; that "*said permanent building shall not have a front- age of over four hundred feet on Michigan Avenue*"; that the mayor and the comptroller of the city were authorized to execute in behalf of the city a contract with the Art Institute granting and securing to it the use and occupation of the building to be erected upon the terms as stated. This ordinance was duly approved by the mayor of Chicago on April 3, 1891.

May 8, 1891, the directors of the Exposition adopted a resolution appropriating $200,000 to apply on the construction of the building, the resolution providing that the building should be *permanently occupied by the Art Institute, the title to remain in the City of Chicago,* then the predecessor of the South Park Com- missioners.

December 3, 1891, the City of Chicago, the Exposition and the Art Institute entered into a written contract pursuant to and in conformity with the terms of ordinances enacted by the City of Chicago. This contract recites the desire of the parties that the building should be *permanent* with the right to use the same given to the Art Institute and states that a large sum of money has been given to the end that the building may be suitable for *"the permanent accommodation of the said Art Institute."*

In 1903 the legislature of Illinois conveyed the fee to Grant Park to the South Park Commissioners, a municipal corporation (see Callaghan's Ill. Annot. Stats., chap. 105, ¶¶ 151 and 152). Thereafter, on July 21, 1903, the city council of Chicago passed an ordinance giving the consent of the city to the transfer and granting to the South Park Commissioners the right to take, regulate, control and govern all that part of Grant Park lying west of the Illinois Central Railroad Company's right of way and north of the north line of Jackson Street extended, subject to certain rights, reservations and exceptions, as stated:

*"First.* The right of the Art Institute of Chicago as defined by an ordinance of the City Council of the City of Chicago passed on the 30th day of March, A. D. 1891, and duly approved by the Mayor of said City on the 3rd day of April, A. D. 1891, and the contract between the City of Chicago and said Art Institute bearing date the third day of December, A. D. 1891, and the terms, provisions and conditions thereof, and to the rights, occupation, uses and benefits of the Art Institute of Chicago thereunder, all and every of which the South Park Commissioners accept, assent to and do and will permit."

By the second section of this ordinance the mayor and comptroller were directed to execute, acknowledge and deliver all instruments necessary or proper in order·to transfer all right, title and interest of the city

"to the building known as the Art Institute of Chicago to the said South Park Commissioners, and to carry out the intent and meaning of this ordinance.''

December 30, 1903, by ordinance duly passed the South Park Commissioners accepted the transfer subject to all the legal rights, reservations and exceptions therein contained, and the jurisdiction of the South Park Commissioners was extended to all of Grant Park as the same existed at that time. It is stipulated that prior to the acceptance by the Park Commissioners, a majority of the owners of lots and lands abutting on Grant Park, including complainant's predecessors in title, who were owners at that time of all of the property now owned by complainant, had in writing consented to the transfer of Grant Park to the South Park Commissioners, but several of complainant's predecessors in title expressly reserved in their written consents all their rights to their easements over the park. Pursuant to that ordinance the City of Chicago by Carter Harrison, mayor, executed an indenture whereby the city granted, conveyed and transferred to the South Park Commissioners "all the right, title and interest of the City of Chicago aforesaid, in and to the building known as the Art Institute of Chicago, which is referred to in said ordinance of July 20, 1903, and which is situated upon that portion of the said premises known as Grant Park, otherwise known as Lake Front Park, in the said City of Chicago, which is referred to and described in and covered by said ordinance of July 20, 1903; . . . but subject, as in said ordinance of July 20, 1903, provided, to the right of the Art Institute of Chicago as defined by said ordinance of March 30, 1891, and said contract and the terms, provisions and conditions thereof, and to the rights, occupation, uses and benefits of the Art Institute of Chicago thereunder, all and every of which the South Park Commissioners have accepted, assented to, done and permitted, and accept, assent to, do and will

permit, as provided in and by said ordinance of July 20, 1903." This transfer is also signed by Lawrence E. McGann, city comptroller, is under seal and is attested to by Fred C. Bender, city clerk.

June 27, 1895, the City of Chicago enacted an ordinance which extended the limits of Lake Front Park eastwardly to the line then established, or to any other line that might thereafter be established by the government of the United States as a harbor or dock line. The General Assembly of Illinois by an act approved April 24, 1899, changed the name of Lake Front Park to Grant Park. By an amendment to that act approved May 10, 1901, the legislature granted to the City of Chicago the right to fill in the submerged land for park purposes. By an act of the General Assembly approved May 14, 1903, Grant Park was conveyed to the South Park Commissioners.

It is stipulated by the parties with reference to ordinances of June 27, 1895, and October 21, 1895, and acts of April 24, 1899, May 10, 1901, and May 14, 1903, and decisions of *City of Chicago v. Ward,* 169 Ill. 392; *Bliss v. Ward,* 198 Ill. 104; *Ward v. Field Museum,* 241 Ill. 496; *South Park Commissioners v. Montgomery Ward & Co.,* 248 Ill. 299, and *Illinois Cent. R. Co. v. People,* 146 U. S. 387, that—

"The findings of the respective courts and the facts as stated by said courts in all of said decisions, opinions and decrees, and the said Acts and Ordinances are hereby, by this reference, included in and by the agreement of the parties made a part hereof and are agreed facts in this proceeding as completely as though set forth *verbatim* herein."

August 3, 1889, one Leland, an owner of lots abutting on Michigan Avenue, to which the easement in question was appurtenant, filed his bill in behalf of himself and other owners, making defendants thereto the City of Chicago and others. He prayed that the defendants should be enjoined from erecting any struc-

tures on this tract of land and that structures thereon should be removed. A temporary injunction issued October 26, 1889. Sarah Daggett, another owner, similarly situated, was afterwards allowed to appear as a co-complainant. April 6, 1892, Leland withdrew as complainant. March 30, 1891, while that suit was pending, the ordinance heretofore described was enacted and the contract pursuant thereto made. The Art Institute building was erected in 1892 while that suit was pending. Mrs. Daggett caused the Art Institute and the mayor of the city to be cited for contempt for violation of the injunction. The Art Institute and others filed a petition asking that the original order of injunction be modified so as to permit the completion of the building. The mayor and the Art Institute answered the rule to show cause, setting up in their answer the ordinance of March 30, 1891, and the contract entered into pursuant thereto, and alleging that *"all the owners of property interested consented to the erection of the said Art Institute Building upon said Lake Front."* Evidence was heard upon this petition, and the court then ordered and adjudged that the injunction should be "so modified as not to interfere with the erection, construction and use of a building on the Lake Front, between Jackson and Monroe streets, in pursuance of, and as contemplated by an ordinance passed by the city council of the City of Chicago, on the 30th day of March, 1891, and of an act of the General Assembly of the State of Illinois, entitled 'An Act in relation to the World's Columbian Exposition, approved Aug. 5, 1890.' And of all contracts made in pursuance thereof." The original documents, by which the property owners consented, are not in the record.

October 16, 1890, A. Montgomery Ward et al., filed a bill against the City of Chicago, the Illinois Central Railroad Company et al., in the superior court of Cook county, praying that the defendants might be re-

strained from erecting or causing the erection of any structure upon the land now described as Grant Park and might be required to remove lumber, timber, dirt, rubbish, garbage, etc., which had been placed thereon. This case was pending also at the time the Art Institute building was erected, and a decree was not entered therein until September 14, 1896. The decree was in favor of the complainants but contained the following clauses:

"Provided, however, nothing in this decree contained shall be construed to prohibit, enjoin or restrain the use, occupation, repair *or necessary enlargement of the building* known as the Art Institute, situated opposite the east end of Adams street, so long as the same shall be used in accordance with the terms of the ordinance of the City Council authorizing the construction and location of the same. . . ."

This decree was affirmed in *City of Chicago v. Ward,* 169 Ill. 392. The Supreme Court in that opinion, referring to the *Leland* case, says:

"It was then sought to have the above injunction in the *Leland* case modified to permit the erection of this building, and such modification *having been assented to in writing by all the property owners,* it was accordingly modified, notwithstanding the objections of Mrs. Sarah A. Daggett, whose husband had signed her assent to the proposed modification. In pursuance of the permission thus granted the Art Institute building was subsequently erected with a frontage of about 300 feet.

Again, the opinion says:

"The only permanent building, perhaps, that is excepted from the injunction is the Art Institute, and all the property owners gave their consent to its erection."

The exception in favor of the Art Institute is also noted in the opinion of the Supreme Court in *Ward v. Field Museum,* 241 Ill. 496.

As stated, the written consents of the owners are not before us, but the interpretation which seems to have been put upon the rights of the Art Institute after the erection of the building is significant. It is stipulated that between the years 1893 and 1911, the Art Institute added to the usable area of the original building and constructed additions thereto, all of these additions being east of the original building and west of the right of way of the Illinois Central Railroad; that Fullerton Hall was erected in 1897, Ryerson Library in 1900, Blackstone Hall in 1903, Grand Stairway in 1910, School Additions from 1898 to 1928, General Offices in 1911, and a shipping room in 1916. These various improvements occupied additional area of 56,825 square feet, and the total cost of such improvements was $386,345.31. It is stipulated that this expansion of the Art Institute was in the opinion of its trustees and officers rendered necessary by its growth and development coincident with the growth and development of the City of Chicago. Upon the completion of these improvements the expansion and enlargement of the Institute building had reached the west line of the right of way of the Illinois Central Railroad, and by reason of the fact that the ordinance of March 30, 1891, limited the Institute to a frontage not to exceed 400 feet on Michigan Avenue, 320 feet of which had already been utilized, it became necessary that further enlargement and expansion should extend over the tracks and east of the right of way of the Illinois Central Railroad in order that the original building might retain its original height of two stories and its architectural beauty of form and method of sky lighting.

In the year 1913, with the consent of the Illinois Central Railroad Company and the South Park Commissioners, the Art Institute constructed Gunsaulus Hall, commonly called the "Bridge," which extends from the Art Institute's original building as enlarged

on Michigan Avenue, a distance of 256 feet eastward over the Illinois Central railroad right of way to the park east thereof. This hall or bridge is 60 feet in width, has 14,370 square feet of area, is 74 feet 6 inches above city datum at its highest point, and cost $147,-585.75. Thereafter the Art Institute constructed other enlargements and extensions east of the right of way of the Illinois Central Railroad company, all connected with each other and with Gunsaulus Hall and through the Bridge with the original Art building west of the right of way of the railroad company. From 1920 to 1926 Hutchinson Wing was constructed, in 1922 McKinlock Court, in 1923 Goodman Theatre, in 1924 Decorative Arts Gallery, in 1927 Temporary School, from 1927 to 1928 Permanent School, in 1928 Allerton Wing and from 1928 to 1929 Rehearsal Gallery. These various improvements occupied an additional area of 91,910 square feet and were made at a cost of $1,286,-948.81. Upon their completion these extensions and enlargements were occupied by the Art Institute, and it is stipulated that all were rendered necessary in the opinion of the trustees and officers of the Art Institute by the growth and development of that institution and of the City of Chicago. In 1929 the city had attained to an estimated population of 3,250,000. It enrolled in its public schools in 1928, 514,818 pupils, and the number of its teachers had increased at that time to 12,241. In 1929 the Art Institute school enrolled 4,437 pupils, employed a faculty of 85 instructors and operated its school at an annual cost of $297,000. In the same year the total attendance of visitors was 1,006,122. Its membership of persons making annual payments had increased to 19,017, its annual pay roll was $605,000, its employees numbered 343, the value of its art collections was $15,000,000, the endowment funds held in trust amounted to $7,552,387.59, and the value of its buildings was placed at $6,000,000.

It is further stipulated that all of the extensions and enlargements were with the express consent of the South Park Commissioners, were carried on openly and visibly, were discussed in the public press and were generally known to all of the citizens of Chicago and particularly to the abutting property owners, including complainant's predecessors in title and the officers of complainant, who were all citizens and residents of Chicago; that the constructions were in plain view, and that during said construction the workmen, teams, material and all other activities were easily visible to all persons concerned and were apparent and known to the abutting property owners upon the west side of Michigan Avenue and all others interested in Grant Park; that at no time since the construction of the original building had any legal proceedings been instituted against the Art Institute by any abutting property owner or by others to recover damages or to enjoin its activities in Grant Park; that all of the constructions, including the original building and the subsequent enlargements and extensions, were carried on in good faith by the Institute, relying upon the modified order of injunction in the *Leland* case and the final injunctional decree in *Ward v. City of Chicago,* and the decisions of the Supreme Court of this State in these and other cases mentioned; that during all the time hereinbefore mentioned, the abutting property owners have vigorously and successfully opposed the construction of any other buildings in Grant Park, but that in all of the Supreme Court decisions growing out of such litigation, the right of the Art Institute has either not been questioned or has been expressly recognized and declared to be the only exception permitted.

The Art Institute building is located at the foot of Adams Street, in Grant Park, on the east side of Michigan Avenue, facing west. Complainant's hotel is lo-

cated on the west side of Michigan Avenue, facing east. Between the center line of the Art Institute and the center line of the Stevens Hotel the distance is 2,563 feet. The Art Institute is almost exactly north of the Stevens Hotel, and from none of the windows of that hotel is the view of Lake Michigan over Grant Park obstructed by the Art Institute. The erection of the concrete walls on both sides of the Illinois Central railroad tracks, and the gradual raising of the level of the park by filling in up to a point 22 feet and 6 inches above city datum, have rendered the lake, as well as the Illinois Central trains, invisible from the street level.

We have before us the briefs filed in the Supreme Court while the appeal was pending there, and the opinion of that court has eliminated from our consideration several of the points upon which complainant relies. That opinion distinctly holds (1) that no undecided question as to the infringement of constitutional rights is in the case either under the Constitution of the United States or of Illinois; (2) that no question as to the validity of any ordinance of the City of Chicago or of the South Park Commissioners is involved; (3) that the contract between the South Park Commissioners and the Art Institute may not be properly considered as a municipal ordinance; (4) that a freehold is not involved. Complainant, still insisting that a freehold is involved, has entered a motion to dismiss upon the ground that this court is without jurisdiction, which motion, for obvious reasons, has been denied.

Defendants contend that there remain only three questions open for discussion: First, whether complainant at the present time has a right to raise against the Art Institute the question as to its right to and the extent of its site. Defendants contend that complainant does not have such right and that its bill

should have been dismissed for that reason; that the earlier owner of the hotel property once had the right to raise such a question, but that right was long ago deliberately waived, as was held might be done in *South Park Commissioners v. Ward,* 248 Ill. 299, upon the authority of *People v. Walsh,* 96 Ill. 232. We do not entertain any doubt of the right of such owner to waive any and all his rights acquired under such an easement as exists here, as was held in *City of Chicago v. Ward,* 169 Ill. 392. Such right may be waived as to one party and not as to another or may be waived as to one part of the premises and not to another. Such waivers would not destroy the easement. The opinion of the court states (and we assume it to be true) that the original waivers were in writing, but as already stated, those writings are not before us and we can only know from adjudication of the courts, by necessary inferences from other documents, from the construction put upon the same by the parties, the terms and conditions, if any, upon which these waivers were made. As to the original building and additions thereafter erected prior to the filing of the bill, we entertain no doubt that under the adjudication of the courts and by reason of the admitted acquiescence of this complainant, its right to object that any or all of these violate its rights under the easement must be deemed waived. It by no means follows that its rights under the easement have ceased as against this institution, and upon a proper showing we do not doubt the right of complainant to object and in a proper case, obtain relief. In other words, its status as the holder of rights under the easement and to maintain these rights against the defendants has not been destroyed as defendants contend.

A second question is argued by the parties, namely, the question of the right of the South Park Commissioners on behalf of the public to stipulate with the

Art Institute for the occupancy of a larger area of its site on which to enlarge its present building for the uses of the Institute. It is contended by complainant that the Institute has no such right, while defendants say that the question has been decided contrary to complainant's contention in *Furlong v. South Park Commissioners,* 340 Ill. 363, 367. We do not understand that any question of the rights of property owners under the easement here considered or analogous thereto was involved in that case. That in general the Commissioners and the Art Institute have the right and the power to contract with reference to property in which they are mutually interested, is not questioned, and that decision, as well as *Maskin v. Chicago,* 93 Ill. 105; *Mound City v. Mason,* 262 Ill. 392, and *Potter v. Fond du Lac Park Dist.,* 337 Ill. 111, sustain that proposition. Indeed, that power and authority has been expressly given by statute (see Cahill's Ill. Rev. Stats. 1929, ch. 105, ¶ 369.) Defendants have the right to contract with each other concerning this property, but they cannot of right make a contract concerning it which would be destructive of complainant's rights under the existing easement. The controlling question in the case is whether the proposed enlargement and additions provided for under the contract of January 18, 1928, as entered into between these parties would violate the rights of complainant under the easement. The contract itself recognizes the obligation of the parties to respect complainant's rights under the easement. It specifically provides:

"Any and all of the permits and permission herein granted by the said South Park Commissioners to the Art Institute of Chicago, are subject to the rights, if any, of any persons, firms or corporations, referred to in the decisions of the Supreme Court of Illinois relative to Lake Front Park or Grant Park being forever free of buildings,"

574

Further, the contract recites that the present building in Grant Park occupied by the Art Institute has become inadequate; that the time has arrived for the Art Institute to secure final and definite plans for a complete museum building; that the most feasible plan submitted is for the construction of proper additions to the existing building now occupied, which additions should be large enough to take care of the extensions of the Art Institute for the next 50 to 100 years in order that it may keep step with the growth and development of Chicago and the Middle West. It recites that the Art Institute has arranged to conduct a competition among leading architects of America and Europe for the purpose of securing the best available plans and specifications, and that additional space in Grant Park is necessary upon which to build such additions. For this purpose the contract expressly grants the right to occupy the land as shown by the plat. It grants permission to erect such additions which shall become a part of the building now used and occupied and to be the property of the South Park Commissioners, but provides that such additions shall be used and occupied by the Art Institute for the purpose of a museum for the collection and display of objects pertaining to the arts and sciences, and subject to the conditions therein contained. These conditions, in substance, are: No work of construction on any of the additions should be done until a competition among the leading architects of Europe and America has been conducted and a comprehensive plan for the development of the additional land by the erection of a building or museum of distinguished architectural design and appropriate interior arrangement, including specifications for the additions, shall have been submitted to and approved by the South Park Commissioners. Detailed plans and specifications must also be submitted to the Commissioners before any such additions

shall be erected. The building now used and occupied, as well as all additions, must be maintained by the Art Institute in good order and condition, and the public admitted thereto, in accordance with the terms and provisions of an act entitled, "An Act concerning Museums in Public Parks," approved June 17, 1893, in force July 1, 1893, as amended by an act approved May 14, 1903, in force July 1, 1903, Cahill's St. ch. 105, ¶ 369 *et seq.;* that the Art Institute shall furnish to the South Park Commissioners a detailed statement of the annual cost of maintaining and caring for the Institute and the buildings and grounds thereof; that the Art Institute shall open to the public without charge on Sunday and on two other days of each week, and to the children in actual attendance upon any of the schools of this State, at all times; that the buildings, lawn, walks and other appurtenances of the park allocated to the use of the Art Institute shall be kept in a manner to conform with the general park development according to the plans to be furnished by the Institute and approved by the Commissioners, and shall be kept in a clean and sanitary condition and free of any and all nuisances; that the Art Institute shall construct and maintain at its sole expense four enclosed bridges over and across the right of way and tracks of the Illinois Central Railroad Company, provided that the bridges shall be constructed according to plans and specifications submitted to and approved by the Commissioners, and provided that the Art Institute obtains the consent of the Illinois Central Railroad Company thereto.

The several ordinances, contracts, agreements and decisions of the courts, as hereinbefore recited, seem to us in every provision to contemplate the possession of a portion of Grant Park by the Art Institute permanently for the purposes for which it was created and with a view to its future expansion and development

as the city in which it is situated should expand and develop. It seems to be a necessary inference from all the evidence recited that this was the intention of the respective parties at the time the owners upon Michigan Avenue executed their written consents to the location and construction of the original building. Not only does that intention appear from the language of the documents, but it is corroborated by the contemporaneous and continued construction which seems to have been put upon these waivers during the years in which no objection has been made to the continuous development of the Art Institute as an institution. We hold such to be the reasonable construction. The easement of complainant and other property holders is not destroyed, but they have, as the *Daggett* case shows and the *Ward* case holds, given their consent to the erection of the original building and to such enlargements as may become necessary by reason of the growth and expansion of the community in which the institution is located.

Such enlargements must be reasonably necessary. They must be made in good faith. They may not occupy more than 400 feet frontage on Michigan Avenue and must in all respects conform to the provisions of the ordinance of March 30, 1891, as construed and determined in the *Daggett* case and in *City of Chicago v. Ward,* 169 Ill. 392.

Both parties appeal to the doctrine of *res adjudicata.* Defendants, as already stated, rely on *City of Chicago v. Ward* and the *Daggett* case, both of which have already been considered. Complainant relies on all the cases in which its rights under the easement have been repeatedly declared and definitely established. We hold that in substance the rights of the parties have been settled and determined in those cases. Complainant has its easement except in so far as it has been waived in favor of defendants. Complainant has

waived its rights thereunder so far as the present use and occupation of the defendant Art Institute is concerned and so far as the enlargements of the Art Institute now or in the future may make necessary the erection of other buildings which are an essential part of the Art Institute. *City of Chicago v. University of Chicago,* 228 Ill. 605.

From a colloquy which occurred at the time the decree was entered and which appears in the record, it would seem that the trial court was of the opinion that there was no evidence in the record tending to show the proposed additions were reasonably necessary. The evidence, we think, appears in the stipulation, tending to show this; but if it did not so appear we would nevertheless be of the opinion and hold that under the facts such as appear here, the bill failing to state that the proposed enlargements were unnecessary, complainant is not entitled to relief as prayed.

Defendant Art Institute upon the trial offered to enter into a voluntary stipulation by which it would impose upon itself certain limitations to the effect that in case it should be held that the Institute might lawfully erect upon the site the further enlargements of its building now proposed and described in the pleadings, there might be incorporated in the decree the following as the meaning and intent thereof:

"That the boundaries of the ground of the total area upon which it claims the right to erect such buildings are as follows:

Not further north than the south line of Monroe street extended.

Not further south than the north line of Jackson street extended.

Not further west than the present location of its Michigan Avenue frontage. And not further east than the west line of the west drive as shown on the plat

(Ex. D—p. 56 stipulation of facts) of the ground in question attached to the stipulation of facts herein.

Also, that any such building on its Michigan Avenue frontage shall not extend more than four hundred (400) feet from the north to south.

Also, that no part of the proposed new structure shall be of any greater height above datum than the highest point of its present existing building on the Michigan Avenue frontage, unless merely by way of ornament, pinnacles or flagpoles."

We think these stipulations might well be incorporated in the final decree entered in case complainant should agree.

For the reasons which we have indicated the decree of the circuit court will be reversed and the cause remanded with directions to enter a decree in conformity with the views expressed herein.

*Reversed and remanded with directions.*

O'Connor and McSurely, JJ., concur.